Jack LESMEISTER, Respondent,

v.

Bob DILLY, Jr., et al., Defendants.

Bob DILLY, Jr., Respondent,

and

Monarch Industries, Inc., defendant and third party plaintiff, Appellant,

v.

ATLANTIC BUILDING SYSTEMS, INC., third party defendant, Respondent.

No. 81–1047.

Supreme Court of Minnesota.

Jan. 14, 1983.

On Motion For Reargument Feb. 14, 1983.

Murnane, Conlin, White, Brandt & Hoffman, Thomas M. Conlin and Robert W. Murnane, St. Paul, for appellant.

Dewey M. Nelson, Morris, for Lesmeister.

Richard S. Roberts, Wheaton, for Dilly.

Prindle, Maland, Sellner, Stennes & Thompson and Thomas L. Thompson, Montevideo, for Atlantic Building Systems, Inc.

PETERSON, Justice.

This appeal arises from an action brought by Jack Lesmeister against Bob Dilly, Jr. and Monarch Industries, Inc. (Monarch) for damages sustained due to defects and lateness in construction of a grain storage building. Monarch impleaded Atlantic Building Systems, Inc. (Atlantic), which designed and fabricated the building. The parties then made various counterclaims and crossclaims against each other.[1] Based on a jury special verdict, judgment was entered for Lesmeister against Monarch for $32,077.40; for Dilly against Lesmeister for $22,580.45; for Dilly against Monarch for $17,741.79; and for Dilly against Monarch and Lesmeister for 90% of his costs. Also granted was a materialman's lien to Dilly against Lesmeister's property plus $5,000 attorney fees incident thereto. Monarch and Lesmeister seek review of the judgments and the order denying their motions for judgment notwithstanding the verdict or a new trial.[2]

The legal and factual issues of this case are a tangle. We recount the facts briefly in keeping with our longstanding principle that on appeal the evidence will be viewed in the light most favorable to the verdict.

In the summer of 1978, Lesmeister decided to erect a new building at his farm to store grain and to serve as a shop for his farm machinery. Grain storage space was needed for his upcoming 1978 corn crop, due to a truck and boxcar shortage. David Trelstad, a neighbor, was regional manager for Monarch, a wholesaler of prefabricated farm buildings. Monarch sold its buildings to salesmen who, as independent contractors, sold to the public. Trelstad was not a salesman; his role was to recruit new sales personnel for Monarch.

Trelstad contacted Lesmeister regarding the building and subsequently showed him sketches of a building which Trelstad said Monarch could supply. The building was to be of steel construction, 60′ × 150′, all to be used for grain storage except one 25′ × 60′ end section which was to be a shop. Several doors were to be installed: one 10′ × 10′, one 24′ × 14′ (wide enough for corn planters and grain drills), and a personal door. Because no other storage was available, Lesmeister wanted the building completely erected by September 1, which Trelstad promised would be done. Lesmeister agreed that the building as described by Trelstad would suit his needs.

Because he could not sell buildings himself, Trelstad asked Bob Dilly to serve as the salesman. Dilly, age 25, had been a Monarch salesman only a few months, had never previously sold a building, had no construction experience, and had received no training from Monarch. Trelstad agreed to handle the details and brought Dilly to meet Lesmeister. Trelstad obtained a contractor's bid for $9,000 to pour the cement slab and $7,000 to erect the building. Lesmeister and Dilly signed a contract for the building components at a total price of $31,933.26. Thereafter, Trelstad telephoned Monarch to place the order. He dialed, then handed the receiver to Dilly and told him to read the list of components, which Dilly did.

---

1.  Dan Brown, the contractor who erected the building, was not a party to this action, having reached a settlement with Lesmeister.

2.  Monarch filed a notice of appeal, and Lesmeister filed a notice of review, in conformity with Minn.R.Civ.App.P. 106.

Lesmeister signed a contract with Dan Brown for the cement work and erection of the building. Brown, age 29, was inexperienced—he had never erected a building or poured such a large cement slab. The contract price ($9,000 for the cement slab; $7,000 for erection of the building) was based on another contractor's tentative bid. The erection price was reduced to $6,000 in exchange for Lesmeister's promise to help with the work.

Monarch required Dilly to pay for the building components before delivery, and he did so. Lesmeister's contract with Dilly obligated him to pay Dilly before delivery of the building, but Dilly apparently agreed not to assert this right until Lesmeister received the proceeds of a government agricultural loan for which he had applied. Dilly never received any payment. To pay Monarch, he borrowed money, secured by assets of his parents and grandmother, incurring $10,300 in interest expense.

Construction of the building was plagued by problems from the start. Brown began the concrete work without bolts or adequate anchor bolt plans. The building components were not delivered until October 27, 1978. Atlantic fabricated one beam wrongly. Brown admitted he installed one beam in the wrong location. The screws initially supplied were not self-drilling as Brown had been led to believe; Dilly ordered new screws, but they did not arrive until December 21, 1978. Also, a "grain kit" (material necessary to outfit the building for grain storage) and a one-piece roof had not been properly ordered and were not obtained until December 21, 1978.

In the meantime, Lesmeister had harvested his corn and dumped 38,000 bushels on the cement slab where Brown was erecting the frame. This interfered with construction. When the new materials arrived, Lesmeister, despite the fact that not all the frame was complete, directed Brown to put on the sides and roof so the corn could be covered. Expert testimony indicated that all "red iron" (the heavy metal framework), including the grain kit, should have been assembled before the sides and roof were attached. Also, when Brown's crew was attaching the side panels, Lesmeister asked them to change their procedure so the wind would not be able to catch the panels. They did so, not realizing that as a result there was no longer a special groove for the caulking compound used to make the building waterproof. Construction in mid-December was further complicated due to the freezing temperatures: the metal sheets were hard to handle, and the caulking had to be heated to make it pliable enough to use.

When erection of the building was approximately halfway complete, Brown left the jobsite due to a payment dispute with Lesmeister. Thereafter, Lesmeister hired Kenneth Wilson, an experienced contractor, to complete the building. Wilson did so as best he could; however, he testified that the building was not suitable for grain storage. The roof leaked, despite Wilson's work; fixing it would cost $5,000–$7,000 more. The two large doors had been intended to go in a corner of the building; this turned out to be impossible. The 10′ × 10′ door was walled over. The 24′ × 10′ door was too big to fit in a 25-foot bay as planned. When Lesmeister later put sunflower seeds in the building, the screws holding the sides to the frame gave way, letting the grain spill out. Wilson was paid $6,800 by Lesmeister for his work. The red iron of the grain kit was not installed.

Snow fell on the corn, beginning in November; the moisture would later cause 4,000 bushels to rot. Lesmeister and his family spent 150 hours or more sweeping snow off the corn, blowing it, and turning it to keep it cool. The remaining 34,000 bushels had to be redried at a cost of $9,549 plus a shrinkage loss of 4,500 bushels of corn plus a loss of 60 cents per bushel of remaining redried corn. Lesmeister estimated that the reasonable rental value of the building, properly constructed, would be $10,000 per year for the grain storage area and $3,600 per year for the shop; properly constructed, the building would be worth $50,000 but as constructed was worth nothing.

Monarch introduced evidence that Lesmeister had received a two-piece roof which he refused to return when his one-piece roof arrived. Brown testified that Lesmeister had used the two-piece roof sheets on other farm buildings. The value of the two-piece roof was $4,561.

Lesmeister's action against Dilly and Monarch alleged breach of contract and negligence in performance of the contract—based on late construction, defective components, and inadequate plans—and breach of implied warranties of fitness and merchantability. Monarch impleaded Atlantic, the designer and fabricator of the building, for damages caused by defective fabrication and inadequate plans. Dilly counterclaimed against Lesmeister, seeking to obtain foreclosure of a materialman's lien for the items supplied to Lesmeister, and sought recovery on the contract. Monarch counterclaimed against Lesmeister for $4,561, the value of the two-piece roof which he refused to return.

The theories of the case were discussed by the court and attorneys before closing arguments. Initially the parties appear to have agreed to separate the contract and negligence claims, but later, disagreement arose as some parties wanted to merge all claims. Lesmeister's counsel demanded that contract damages be submitted separately from the negligence and warranty damages. The court then produced a 10-page special verdict form which merged all three claims and allowed fault to be apportioned among the several parties. Our reading of the transcript convinces us that only Lesmeister made an adequate objection to merger of the contract and negligence theories.

As to defective construction by Brown, the court instructed the jury that Monarch, Dilly, and Atlantic were not responsible for any damages resulting from Brown's negligence in performance of the cement work and erection of the building but that they could be liable for damages directly resulting from their negligence, breach of contract, or breach of warranty found to have prevented Brown, when he was using due care, from completing or making a good and workmanlike erection of the building. Furthermore, Brown could not be held negligent for acts in erecting which Lesmeister had directed. Upon concluding, the court asked if there were any objections to the instructions, and no party raised any further objection.

Briefly stated, the jury found that Lesmeister's building, as constructed, was worth $20,000, exclusive of the cement slab valued at $9,000.[3] The jury also found Lesmeister suffered the following damages:

| | |
|---|---|
| damages to stored corn | $33,000 |
| lost use of the building | 22,500 |
| expenses of salvaging corn and repairing building | 25,564 |
| | $81,064 |

Fault for these damages was apportioned as follows:

| | |
|---|---|
| Lesmeister | 40% |
| Dilly | 5% |
| Monarch | 40% |
| Atlantic | 5% |
| Brown | 10% |
| | 100% |

The apportionment of 5% of fault to Dilly is inconsistent, since the jury found that there was no breach of contract by him, that his negligence was not a cause of Lesmeister's damages, and that there was no breach of warranty by him.

The trial court calculated damages as follows:

| | |
|---|---|
| $ 81,064.00 | damages |
| −20,000.00 | value of building |
| $ 61,064.00 | |
| −24,425.60 | 40% attributable to Lesmeister |
| $ 36,638.40 | |

Monarch was held liable to pay this amount because all defendants were cotortfeasors. Monarch's liability to Lesmeister was reduced by $4,561, representing the value of the two-piece roof which the jury found Lesmeister had wrongfully refused to re-

---

**3.** In closing argument, Monarch's counsel stated his opinion that the building was worth $20,000. No testimonial evidence had been produced by the parties to support this figure, but the jury was shown pictures of the building.

turn; hence Monarch was ordered to pay Lesmeister $32,077.40.

The jury found that Dilly had suffered the following damages:

| | |
|---|---|
| actual monies expended | $32,502.50 |
| interest charges | 10,300.00 |
| lost profits | 2,000.00 |
| | $44,802.50 |

Fault was apportioned as follows:

| | |
|---|---|
| Lesmeister | 50% |
| Dilly | 10% |
| Monarch | 40% |
| Atlantic | 0% |
| | 100% |

The trial court calculated damages as follows:

| | |
|---|---|
| $44,802.50 | damages |
| 4,480.25 | less 10% attributable to Dilly |
| $40,322.25 | |
| ⅝ths, or $22,580.46 | to be paid by Lesmeister |
| ⅘ths, or 17,741.79 | to be paid by Monarch |
| $40,322.25 | |

Dilly was awarded 90% of his costs and disbursements. The trial court ruled that all judgments in favor of Dilly against Lesmeister constituted materialman's liens on Lesmeister's farm and gave judgment for Dilly in the sum of $5,000 for attorney fees expended to obtain a materialman's lien on Lesmeister's farm.

Motions for judgment notwithstanding the verdict or a new trial were made by Lesmeister and Monarch. The motions were denied.

The procedural posture of this appeal is peculiar. Neither Monarch nor Dilly nor Atlantic objected to the verdict form or jury instructions during trial. Monarch's motion for a new trial assigned as error the merger of the contract and negligence claims, but its brief on appeal does not adequately raise the issue.[4] Because of this, several issues in this case will be governed by the "law of the case," which was

4. The briefs generally would have been more helpful had they been less cryptic and more responsive to Lesmeister's challenges to the verdict.

5. As recalculated, the parties' shares of negligence will be:

created by erroneous instructions by the trial court to which the parties did not sufficiently object. *Zylka v. Leikvoll,* 274 Minn. 435, 446, 144 N.W.2d 358, 366 (1966); *Gryc v. Dayton-Hudson Corp.,* 297 N.W.2d 727, 38–39 (Minn.1980), *cert. denied,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980); *Coble v. Lacey,* 252 Minn. 423, 433, 90 N.W.2d 314, 322 (1958). As a consequence, we at times apply law that is not in accord with settled doctrine, and we therefore limit the holding to these facts. We do not intend this opinion to have precedential effect either as to theories of relief or measures or elements of damages.

■ 1. On appeal, Monarch primarily challenges the sufficiency of the evidence to support the verdict. It is settled that on appeal, the court views the evidence in the light most favorable to the prevailing party. The verdict will not be reversed if the evidence reasonably or fairly tends to sustain it. We hold from our review of the transcript that the verdict was not without requisite evidentiary support.

■ Two items, however, deserve brief comment. First, the jury heard testimony that the building as constructed was worth nothing but if properly built would be worth $50,000. Although Kenneth Wilson testified that the building was not suitable for grain storage, it is apparent that it could serve other purposes. The jury also could evaluate the many pictures of the building submitted as exhibits. The $20,000 figure is within the range of acceptable values. Second, we believe the 5% inconsistency of the jury's action as to Dilly's negligence is not of sufficient magnitude to justify a new trial, especially where neither appellant's brief raises the issue. *Cf. Bellon v. Klawitter,* 323 N.W.2d 735 (Minn.1982). The 5% will be reallocated to the other parties in proportion to their respective shares of negligence.[5]

| | | |
|---|---|---|
| Lesmeister | 40/95ths or | 42.11% |
| Dilly | | 0% |
| Monarch | 40/95ths or | 42.11% |
| Atlantic | 5/95ths or | 5.26% |
| Brown | 10/95ths or | 10.52% |
| | | 100.00% |

2. The trial court granted Dilly a materialman's lien despite his failure to produce any evidence at trial regarding timely filing of the lien notice. Apparently a lien notice was recorded on May 7, 1979, stating that the last delivery of materials from Dilly to Lesmeister occurred on April 24, 1979. The date of last delivery is important, since the lien ceases to exist unless the notice was recorded within 90 days of the last delivery of material to the site. Minn. Stat. § 514.08, subd. 1(1) (1980).

A copy of the materialman's lien notice had been attached to Dilly's counterclaim; Lesmeister's reply denied the allegations. During the trial, however, Dilly introduced no evidence regarding the lien, the legal description of Lesmeister's property, the fact of recording the notice, the last delivery date of materials to Lesmeister, or the efforts of attorneys to foreclose the lien. On the other hand, there was extensive testimony by Lesmeister, Brown, and Monarch's vice president indicating the last goods to be delivered—the one-piece roof, self-drilling screws, and grain kit—arrived on December 20, 1978. Lesmeister's motion for directed verdict, based on Dilly's failure to present evidence, was denied.

No issues relative to the materialman's lien were submitted to the jury. The court evidently determined the issues itself and awarded a lien and $5,000 attorney fees; no findings of fact appear in the record.

As noted earlier, on appeal the court will review the evidence in the light most favorable to the prevailing party to see if it reasonably supports the verdict. In this case, however, Dilly presented *no* evidence at trial to show when goods were last delivered or that his notice was timely recorded. We hold there was no evidence on which the district court could grant him a judgment foreclosing the lien. Given the uniform testimony of the other witnesses, the only possible conclusion which can be drawn from the evidence presented at trial is that the last goods were delivered on December 20, 1978, so that the notice was recorded too late and the lien expired. Dilly's brief does not respond to this issue raised by Lesmeis-

ter. The order and judgment, insofar as it grants a materialman's lien and attorney fees incidental thereto, is reversed.

3. Question 8[c] of the special verdict form asked (and was answered) as follows:

If you have found that two or more of the parties—Monarch, Dilly, Atlantic, Brown or Lesmeister, to have breached a contract, or were negligent, or breached a warranty, and that such breach or negligence was a direct cause of damage to Lesmeister, then answer the following question:

Taking the combined fault that contributed as a direct cause of damage to Lesmeister as 100 percent, we apportion such fault as follows:

| Monarch | 40 | percent |
|---|---|---|
| Dilly | 5 | percent |
| Atlantic | 5 | percent |
| Brown | 10 | percent |
| Lesmeister | 40 | percent |
| | 100 | percent total |

Lesmeister objected to this question at trial and now attacks the verdict on the grounds the question improperly allows application of the comparative fault statute, Minn.Stat. § 604.01 (1980), to a contract claim. The trial judge relied on the above percentages to reduce Lesmeister's damage award.

The definition of "fault" in the comparative fault statute expressly includes negligence and breach of warranty. Minn. Stat. § 604.01, subd. 1a (1980). For two reasons, it appears that the statute was not intended to apply generally to contract cases. First, contract law has never spoken in terms of fault; the contract measure of damages generally is based on recovery of the expectancy or benefit of the bargain. Second, the statute derives from the Uniform Comparative Fault Act. Steenson, *The Anatomy of Products Liability in Minnesota: Principles of Loss Allocation,* 6 Wm. Mitchell L.Rev. 243, 334 (1980). Within the commission's comments to section 1 is the following sentence:

There is no intent to include in the coverage of the Act actions that are fully

contractual in their gravamen and in which the plaintiff is suing solely because he did not recover what he contracted to receive.

12 U.L.A. 35 (Supp.1982). Thus, if this case was essentially based on a contract theory, fault should not have been allocated, and an instruction to the contrary would constitute reversible error.

In this case the jury, in addition to contract issues, also was instructed as to negligence and breach of warranty. The negligence action was apparently based on this theory: the contracts created duties between the parties, which duties were breached, causing harm. Support for the existence of this cause of action derived from *Northern Petrochem Co. v. Thorsen & Thorshov, Inc.,* 297 Minn. 118, 211 N.W.2d 159 (1973), which was somewhat imprecisely described as involving "negligent breaches of contractual obligations." In *Northern Petrochem,* both the architects and the contractor improperly performed their contractual obligations to the owner. We applied the "single injury" rule of *Mathews v. Mills,* 288 Minn. 16, 178 N.W.2d 841 (1970):

> [W]here it is not reasonably possible to make a division of the damage caused by separate acts of negligence, closely related in point of time, the negligent parties, even though they acted independently, are jointly and severally liable.

297 Minn. at 128, 211 N.W.2d at 167. We did not intend in *Northern Petrochem* to recognize a new cause of action in negligence, *i.e.,* negligent breach of a contractual duty. We only announced a rule of damage apportionment applicable where two persons independently and unintentionally breach separate contracts to the same person. We take this opportunity to clarify our intended holding in *Northern Petrochem:* Where A and B owe contract duties to C under separate contracts, and each breaches independently, and it is not reasonably possible to make a division of the damage caused by the separate breaches closely related in point of time, the breach-

ing parties, even though they acted independently, are jointly and severally liable.[6]

The gravamen of this case in our view is contractual. Any duties between the parties arose out of contracts, about which there was opportunity to bargain and allocate risks and duties. This was not a situation in which parties were fortuitously brought together, as in an automobile accident. We conclude, therefore, that it was error to submit the theory of "negligent breach" of contract to the jury, or to allow apportionment of fault either based on the pure contract or the "negligent breach" cause of action.

Notwithstanding the existence of errors which in other contexts might be ground for reversal, we believe substantial justice can be achieved by recalculating the damages on the basis of figures set by the jury. The jury made extensive factual findings, which we have found to be supported by the evidence. The errors about which Lesmeister complains essentially involve the proper application of the law to these findings. Our disposition salvages the jury's decision, while avoiding the necessity for a lengthy and expensive new trial.

4. The central issue on appeal is to determine the correct measure of damages. Given our determination that this case essentially sounds in contract, the damage award should place Lesmeister in the position in which he would be if the contract were performed. In *Northern Petrochem,* damages for breach of a construction contract were defined as:

> [E]ither the cost of reconstruction in accordance with the contract, if this is possible without unreasonable economic waste, or the difference in the value of the building as contracted for and the value as actually built, if reconstruction would constitute unreasonable waste.

297 Minn. at 124, 211 N.W.2d at 165. Testimony at trial indicated that the proper repair of the building would require complete reconstruction; if only minor repairs were

---

**6.** We have no occasion to state at this time whether the same rule will be applied where one or both breaching parties intentionally breach the contracts.

made, the building would not perform adequately. Hence the difference in value is the appropriate measure of damages. Undisputed testimony at trial set the value of the building constructed as per contract at $41,000 exclusive of the slab. The jury set actual value at $20,000. The difference of $21,000 represents damages sustained by Lesmeister.

■ In addition, non-breaching parties should recover damages sustained by reason of the breach which arose naturally from the breach or could reasonably be supposed to have been contemplated by the parties when making the contract as the probable result of the breach. *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854). The jury determined that consequential damages sustained by Lesmeister were $81,064 and by Dilly were $12,300.

■ Lesmeister argues strongly that his damages, being contractual in nature, should not be reduced by any percentage of fault attributable to him. However, Lesmeister should not necessarily recover all his consequential damages. He was under a duty to take reasonable steps to mitigate his damages. Unreasonable failure to mitigate damages is "fault" which can be apportioned under the comparative fault statute. Minn.Stat. § 604.01, subd. 1a (1980). As to all items of consequential damage found by the jury, there was evidence in the record to support an inference that Lesmeister was partially to blame for the losses. He repeatedly ordered Brown to act contrary to the erection instructions; he dumped his corn on the slab before construction was completed. (Perhaps, too, he could have searched more for alternative storage space). Instead of viewing Lesmeister's actions solely as negligence, the jury's verdict can be construed as a finding that he unreasonably failed to mitigate damages.[7]

■ The $21,000 general damages may represent either the damages for breach of contract or breach of warranty; either measure attempts to give Lesmeister the benefit of his bargain, *i.e.,* the value of a properly constructed building. However, because Lesmeister participated in construction of the building and ordered work done in a way inconsistent with good workmanlike practices, we believe the loss of the expected value should be treated not as a general damage but as another item of consequential damage subject to reduction for his failure to mitigate damages. Where his actions helped to cause the loss of the expected value of the building, Lesmeister ought not be allowed to shift the whole loss onto Monarch. We conclude that Lesmeister's total damages are $102,064. This award should be reduced by the percentage of fault attributable to Lesmeister for failure to mitigate his damages, *i.e.,* 42.11%. The complete damage calculation is as follows:

| | |
|---|---|
| Consequential damages (including lost value of building) | $102,064.00 |
| Less 42.11%, $^{40}/_{95}$ths attributable to Lesmeister | −42,974.32 |
| | $59,089.68 |
| Less value of two-piece roof | − 4,561.00 |
| Payable by Monarch to Lesmeister: | $ 54,528.68 |

■ Dilly's damages are recalculated in light of our above ruling. First, Lesmeister alone should be responsible to Dilly for the contract price of the building, since Monarch was not a party to that contract. Second, although the jury determined Dilly expended $32,502.50 in buying the building and incidental materials, the contract measure of damages is the amount which he contracted to receive, which the record clearly indicates was $31,993.36. Lesmeister is responsible to pay that amount to Dilly.

No party has challenged the propriety of Dilly's consequential damages of $12,300 for

---

7. *Cf. Bemidji Sales Barn, Inc. v. Chatfield,* 312 Minn. 11, 250 N.W.2d 185 (1977), in which we upheld the trial court's reduction of a verdict by $2,000, based on "contributory negligence." We stated that the trial judge should more correctly have predicated his finding on failure to avoid injurious consequences rather than on contributory negligence. 312 Minn. at 16–17, 250 N.W.2d at 189.

interest expense incurred and lost profits.[8] We accordingly allow them as consequential damages in this case, to be reduced by the 10% of fault attributable to Dilly, and paid ⅚ths by Lesmeister and ⅜ths by Monarch, in accordance with the trial court's disposition. The damages calculation is as follows:

| | | |
|---|---|---|
| General damages — amount owed by Lesmeister, as per contract with Dilly: | | $31,993.36 |
| Consequential damages: | | |
| Interest | $10,300 | |
| Lost Profits | 2,000 | |
| | $12,300 | |
| Less 10% attributable to Dilly | −1,230 | |
| | $11,070 | |
| Lesmeister's ⅚ths of consequential damages | | 6,150.00 |
| Total payable from Lesmeister: | | $38,143.36 |
| Monarch's ⅜ths of consequential damages | | |
| Total payable from Monarch: | | 4,920.00 |
| Total awarded to Dilly | | $43,063.36 |

To recapitulate:

(1) The materialman's lien and $5,000 attorney fees granted to Dilly against Lesmeister shall be vacated.

(2) Judgment shall be entered in favor of Lesmeister against Monarch in the sum of $54,528.68.

(3) Judgment shall be entered in favor of Dilly against Lesmeister in the sum of $38,143.36 and against Monarch in the sum of $4,920.

(4) The award to Dilly of costs and disbursements is affirmed.

(5) The judgments entered by the trial court shall be amended consistent with this opinion.

No costs or disbursements are allowed to any party on this appeal.

Reversed in part; affirmed in part as modified; and remanded with instructions.

---

**8.** *Cf. Parkside Mobile Estates v. Lee,* 294 N.W.2d 327, 328 (Minn.1980), in which we stated:

> The only remaining issue is whether or not plaintiffs can claim, as additional damages, finance and interest charges incurred because plaintiffs did not have cash funds to pay for the hook-up charges. The trial court

ruled that these are not proper items of damage as a matter of law. We agree. If the plaintiffs had paid cash for these improvements, the only interest recoverable would be the statutory judgment interest rate and not the market interest rate. We cannot adopt a different rule merely because the plaintiffs were unable to pay cash.

---

**On Motion For Reargument**

SIR:

You will please take notice that on this date the following order was entered in the above entitled cause:

ORDERED, that the petition for reargument herein be and the same hereby is denied and stay vacated.

IT IS FURTHER ORDERED that no attorneys fees are allowed pursuant to Rule 140, Rules of Civil Appellate Procedure.