Vernon H. REDISKE, et al.
Appellants (C4–85–179),
Respondents (C0–85–180),

v.

MINNESOTA VALLEY BREEDER'S AS-
SOCIATION, e.b.a. MVBA Harvestore
Systems, Defendants (C4–85–179), Ap-
pellants (C0–85–180),

A.O. Smith Harvestor Products, Inc., et
al., AgriStor Leasing, Respondents
(C4–85–179).

Nos. C4–85–0179, C0–85–0180.

Court of Appeals of Minnesota.

Sept. 24, 1985.

Review Granted Dec. 11, 1985.

James P. Larkin, Jerome H. Kahnke, Minneapolis, for Vernon H. Rediske, et al.

Charles F. Angel, Rochester, for Minnesota Valley Breeder's Association, e.b.a. MVBA Harvestore Systems.

Steven D. Jamar, Minneapolis, for A.O. Smith Harvestor Products, Inc., et. al.

William D. Hull, Minneapolis, for Agri-Stor Leasing.

Heard, considered and decided by RANDALL, P.J., and WOZNIAK and LANSING, JJ.

## OPINION

RANDALL, Judge.

Minnesota Valley Breeders Association ("MVBA") and Robert Maust appeal the jury verdict in favor of respondents, Vernon and Sandy Rediske, for breach of contract, fraud, and negligent installation in the leasing and construction of the Model

8123 Slurrystore. The Rediskes appealed an earlier grant of summary judgment in favor of defendants AgriStor Leasing and A.O. Smith Harvestore ("A.O. Smith") on all claims made against them by the Rediskes. The two appeals were consolidated by order of this court April 30, 1985. For purposes of this opinion, MVBA and Maust are appellants and the Rediskes are the respondents. We affirm in part and remand for a trial on the comparative negligence of the parties.

## FACTS

On March 20, 1978, Vernon and Sandy Rediske signed a purchase agreement with appellant MVBA for a Model 8123 Slurrystore. The purchase agreement required ten percent down, delivery and installation to be "at any time." MVBA orally promised the system would be installed and operational by September 1, 1978.

A Slurrystore is a large metal tank system connecting a tank, by way of underground transfer lines and pumps, to manure pits. Solid animal waste matter is collected in the pits and pumped through underground lines to the tank where it is stored and eventually used by the farmer as fertilizer.

MVBA, a farmers' cooperative, sells A.O. Smith Harvestore products; AgriStor is a financing company for A.O. Smith and dealerships selling A.O. Smith's products.

In August of 1978, the Rediskes met with Robert Johnson of the Preston, Minnesota, Production Credit Association ("PCA") to arrange financing of the Slurrystore through the PCA. Johnson visited the farm, reviewed its operation, and prepared a cash flow analysis. He concluded, based on his analysis, that the Rediskes could not afford to purchase the Slurrystore.

On October 4, 1978, Robert Maust, branch manager of the MVBA Chatfield store and his associate, Roger McKenzie, discussed Johnson's cash flow analysis with Mr. Rediske. Maust told Rediske that Johnson's analysis was conservative and he revised Johnson's analysis to show more income and fewer expenses. Maust's figures, if believed, would enable the Rediskes to economically purchase the Slurrystore.

When the Rediskes still hesitated and attempted to cancel the purchase, Maust then presented them with a leasing plan through AgriStor. The lease provided for installation to be completed within ten days of the starting date and total completion in the fall of 1978. Maust assured the Rediskes the lease application would be approved. He also promised MVBA could lend financial help if the Rediskes got in financial trouble as a result of leasing the Slurrystore. In fact, MVBA had a policy against extending such help.

AgriStor approved the lease. Robert Benson, an independent contractor, began work on October 26, 1978. Because Benson was simultaneously constructing several other Slurrystores, construction on the Rediske's system was slow and erratic.

Benson's installation crew was behind schedule even though the weather was favorable. There should have been enough time to complete the system before winter. Benson's construction crew was simply overcommitted to other Slurrystore projects and did not complete the Rediskes' system. The Rediskes had not been advised when they contracted for the Slurrystore that Benson had other similar jobs, and that Maust and MVBA had not provided any installation backup.

By December 12, 1978, when construction halted for the winter, the Slurrystore tank was completed and the pits and transfer lines were dug but not finished. The partial completion interfered with the Rediskes' farm operation.

Mr. Rediske had been instructed by MVBA to accumulate enough manure to provide an eighteen inch cover in the Slurrystore tank. Rediske was unable to dispose of that manure when construction halted in December. Additional manure accumulated on a daily basis. This caused increased incidence of mastitis among the cows and resulted in lost milk production and receipts. The manure eventually accu-

mulated to the height of the feeder bunks and froze when winter set in.

The open trenches and pits left by the construction crew forced Rediske to crowd his beef feeder animals, placing more stress on the animals and causing further production loss. He was unable to reach his livestock with his feeding equipment because of the open pits and trenches and he had to hand carry feed to his animals.

Due to incomplete installation, Mr. Rediske was unable to build a nursery for his newly farrowing pigs. Several pigs died despite Rediske's attempts to provide a substitute nursery. One corner of an existing hog building collapsed into an unfilled trench. Anticipated cash revenue from fall production by these animals (assumed by Maust in his cash flow analysis) was lost due to the delayed construction.

Installation of the system was eventually completed in June, 1979, and on July 5, 1979, the parties executed a lease agreement which called for ten annual rental payments of $15,578.02 beginning August 1, 1980.

The Rediskes were unable to make their first rental payment August 1, 1980, and AgriStor granted a deferment to January 1, 1981. The deferment did not help Rediskes' cash flow and they failed to make the January 1, 1981, payment also.

Eventually the Rediskes were forced to sell their livestock and liquidate their remaining assets to meet their obligations. Finally their mortgagee foreclosed on their farm land.

On July 17, 1981, AgriStor terminated the lease and demanded return of the leased equipment. The Rediskes refused AgriStor permission to enter their land to remove the system. A federal district court granted AgriStor's summary judgment motion to repossess the equipment and ordered respondents not to interfere with the repossession.

The Rediskes sued MVBA, A.O. Smith, AgriStor Leasing, Robert Maust, Roger McKenzie, Robert Benson and Elmer Haugstad (a co-worker of Benson) for neg-ligence, breach of contract, and fraud. Prior to trial, the court granted summary judgment dismissing claims against A.O. Smith and AgriStor. The Rediskes withdrew their claims against McKenzie and Haugstad during the trial and settled with Benson on a *Pierringer* release during trial.

Pre-trial motions began April 30, 1984. On that day appellants' attorney, for the first time, notified respondents' attorney that appellants would call Duane Vangsness as their expert witness on damages. The trial began May 8, 1984. Appellants did not furnish respondents with a copy of Vangsness' report until May 8, 1984, just prior to jury selection. The judge ruled that appellants' late disclosure of Vangsness constituted unfair surprise, and refused to allow Vangsness to testify.

The jury returned a $700,000.00 compensatory damage award and $100,000.00 punitive damage award against Maust and MVBA.

## ISSUES

1. Did the trial court err in not submitting the comparative fault of the parties to the jury?

2. Did the trial court err in excluding testimony of appellant's expert who was not disclosed until immediately before trial?

3. Was the evidence sufficient to justify a finding of fraud?

4. Were compensatory and punitive damages excessive and given under the influence of passion and prejudice?

5. Did the trial court err in granting A.O. Smith's and AgriStor's summary judgment motion?

## ANALYSIS

### I.

*Comparative fault*

At the close of testimony, appellants requested that the negligence of both Benson (who had *Pierringered* out during the trial)

and the Rediskes be submitted to the jury. The trial court denied counsel's request. Appellants claim this was error.

■ Minn.Stat. § 604.01, subd. 1 (1984) provides in part:

> The court may, and when requested by any party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each party; and the court shall then reduce the amount of damages in proportion to the amount of fault attributable to the person recovering.

*See, Hill v. Okay Construction Co.*, 312 Minn. 324, 252 N.W.2d 107, 119 (1977) (emphasis added). "Fault" includes negligence. Minn.Stat. § 604.01, subd. 1(a). Here, where the record reveals a demand by appellant's counsel for submission of Benson's and respondents' fault to the jury, the trial court erred in not submitting the question to the jury. There was an arguable basis to submit comparative fault of any party: the trial court should not have denied appellants' request.

Robert Benson settled with respondents by *Pierringer* release during the trial, and he was dismissed from the suit. The court did not submit his negligence to the jury. Appellants are entitled to a remand on this issue.

> [W]here the plaintiff has entered into a Pierringer-type release, settling his claims with some defendants * * * the settling defendants usually should be dismissed, but their negligence should nevertheless be submitted to the jury.

*Frey v. Snelgrove*, 269 N.W.2d 918, 922 (Minn.1978)

Appellants further claim that the trial court erred in submitting appellants' negligence to the jury. Appellants argue that the breach of contract and negligence claims arise from the same conduct and respondents' recovery must be limited to one theory. Appellants cite a number of cases from other jurisdictions to support this contention. This is not the law in Minnesota.

The claims against respondents arose out of several acts, MVBA's breach of its agreement to have the Slurrystore erected and operational by fall of 1978, its negligent construction of the Slurrystore, and the fraud committed by Maust.

Appellants cite *Lesmeister v. Dilly*, 330 N.W.2d 95 (Minn.1983) in support of their argument that because breach of contract was found, appellants could not be found liable under tort and negligence for the same conduct. *Lesmeister* does not limit appellants to one theory of recovery.

*Lesmeister* holds that Minn.Stat. § 604.01, subd. 1(a) (1984), the Comparative Fault Statute, while applicable to negligence and breach of warranty, is not applicable in contract cases. *Id.* at 101.

The judge's post-trial order denying appellants' motions enumerated the theories under which the jury awarded damages: negligence, fraud, breach of contract, and willful indifference to the rights of others. The court noted it had considered giving the jury an interrogatory for each theory, followed by a damage interrogatory. The court rejected that course believing numerous interrogatories would confuse the jury and because each cause of action had some common damage element.

■ The court rejected appellants' argument that *Lesmeister* bars recovery under more than one theory. We agree. However, when submitting the comparative fault of the parties to the jury, the court must bear in mind that fault in breach of contract cases cannot be compared under Minn.Stat. § 604.01, subd. 1 (1980):

> For two reasons it appears that the statute was not intended to apply generally to contract cases. First, contract law has never spoken in terms of fault; the contract measure of damages generally is based on recovery of the expectancy or benefit of the bargain. Second, the statute derives from the Uniform Comparative Fault Act. Steenson, *The Anatomy of Products Liability in Minnesota: Principles of Loss Allocation*, 6 Wm. Mitchell L.Rev. 243, 334 (Minn.1980).

*Lesmeister,* 330 N.W.2d at 101. On remand the trial court should separate out in the special verdict form which damages are attributable to breach of contract and which to negligence and fraud, and compare fault only on the negligence and fraud claims, not on the contract claim.

## II.

### *Exclusion of Expert Testimony*

Approximately six years elapsed between the commencement of this action and the trial. During this time, respondents served appellants with two sets of interrogatories, in January, 1980, and July, 1981, both of which requested disclosure of expert witnesses who might testify at trial.

Respondents' first set of interrogatories asked appellants to:

Identify each person you intend to call as a witness at the trial of this matter and describe the subject matter of the witness' testimony.

Respondents' second set of interrogatories asked appellants to:

Give the names and addresses of all persons engaged, or who Defendant intends to engage, as an expert at the trial of the within matter, and as to each, the area of claimed expertise and as to each, give the names and addresses of all educational institutions subsequent to secondary education attended by such expert, all degrees conferred and the employment of each during the past five years.

To this interrogatory appellants replied, "No expert has been retained. If any expert is retained in the future, this interrogatory will be answered."

Both of these interrogatories imposed a duty on appellants to disclose the identity of expert witnesses prior to trial. Furthermore:

A party is under a duty seasonably to supplement his response with respect to any question directly addressed to * * * (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

Minn.R.Civ.P. 26.05(1).

In a well drafted, thoughtful memorandum incorporated into its order denying MVBA's motion for judgment notwithstanding the verdict, the court explained its reasons for excluding the testimony and we agree that the trial court acted within its discretion under the circumstances in excluding Vangsness' testimony based on unfair surprise.

The court's memorandum noted that this case was one of the oldest civil matters in Fillmore County. Certificates of readiness had been on file a year when the trial judge received the assignment. After unsuccessful attempts to schedule the trial for January, 1984, it was set for April 30, 1984.

Appellants did not contact Vangsness until late February, 1984, and did not meet with him until March 21, 1984. The court set aside the first week of the trial, which was to begin April 30, 1984, to rehear the summary judgment motion. During this delay appellants disclosed Vangsness to respondents.

The court noted that its first inclination was to permit appellants to call Vangsness. However, upon disclosure, respondents properly asked for a continuance. Had the court granted one, the case would have been delayed until the fall, 1984, term. The court was unwilling to permit further delay.

In his memorandum the judge balanced the parties' needs and comparative fault for the delays, assuming that since the case had been pending for so long, Vangsness was probably not significant to appellant's case. The court concluded the better course was to go forward with the trial and preclude Vangsness' testimony.

Under these circumstances we cannot find the trial court abused its discretion:

When a party seeks to introduce expert testimony not previously noticed, determination of the appropriate remedy is within the trial court's discretion.

*Quill v. Trans World Airlines, Inc.,* 361 N.W.2d 438 (Minn.Ct.App.1985) *pet. for rev. denied* (Minn.April 18, 1985), *citing Phelps v. Blomberg Roseville Clinic,* 253 N.W.2d 390, 394 (Minn.1977); *In re Estate of Olsen,* 357 N.W.2d 407, 413 (Minn.Ct. App.1984), *pet. for rev. denied* (Minn. Feb. 27, 1985).

Finally, as the court noted, if appellants delayed consulting Vangsness as a trial tactic, appellants ran the risk that, under the rules of civil procedure, testimony could be excluded.

Appellants' argument that they were relieved of any obligation to disclose their expert witness because respondents did not serve them with a "Rule 26" interrogatory is without merit. Either or both interrogatories listed above, particularly in light of appellants' response, put appellants under a duty to update disclosure of expert testimony.

Likewise, appellants' assertion that respondents were not prejudiced by late disclosure because they could have reviewed Vangsness' report on the weekends during the trial is without merit. Preparing to cross-examine an expert witness in a complicated case involves more than reading the expert's report and having it evaluated by one's own expert. Late disclosure prejudiced respondents by depriving them of time necessary to prepare cross-examination. We cannot say the court was clearly erroneous in this ruling.

### III.

#### Sufficiency of the evidence

Appellants claim the evidence was insufficient to support a finding of fraud against Maust and MVBA. The jury found both Maust and MVBA guilty of fraud. The trial court, in its order and memorandum denying judgment notwithstanding the verdict or a new trial, noted:

> If the jury believed the plaintiffs, there was ample evidence to support a finding that the defendants had agreed to erect and have operational a Slurrystore by the end of 1978. The parties so testified

and the question of credibility is for the jury. Likewise there was ample evidence that the manner in which the construction was undertaken was negligent.

\*    \*    \*    \*    \*    \*

The plaintiffs allege that Robert Maust had made a number of statements as to the effect that the signing of the lease agreement would have on their ability to borrow money. He denied those statements but if they were believed by the jury, they would constitute fraud or material misrepresentation. Further, if the jury believed that Robert Maust deliberately started construction with full knowledge that it could not be completed, solely to secure his commission from MVBA, that would constitute a willful indifference to the rights of the plaintiffs and support the finding of punitive damages. In short, I believe there was ample evidence of liability on the part of the defendants in each of the areas.

■ A careful review of the record shows that the jury's finding is sustained by the evidence:

> It is settled that on appeal, the court views the evidence in the light most favorable to the prevailing party. The verdict will not be reversed if the evidence reasonably or fairly tends to sustain it.

*Lesmeister v. Dilly,* 330 N.W.2d 95, 100 (Minn.1983).

### IV.

#### Compensatory and Punitive Damages

■ Appellant claims the jury awards of $700,000.00 for compensatory and $100,-000.00 for punitive damages were excessive and given under the influence of passion and prejudice. However, in their brief they fail to address the passion and prejudice issue and argue only in a summary fashion that the punitive damage award was not supported by the evidence. We find that neither award mandates a new trial.

The trial court instructed the jury on the elements necessary to award punitive damages required by Minn.Stat. § 549.20, subd. 3 (1984):

Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including the seriousness of hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, the number and level of employees involved in causing or concealing the misconduct, the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons, and the severity of any criminal penalty to which the defendant may be subject.

The jury answered interrogatories tending to show that it had considered these issues, including an interrogatory finding MVBA and Maust guilty of wilfull indifference to the Rediskes' rights.

■ Punitive damages are allowable on a showing of "clear and convincing evidence that the acts of defendant show a willful indifference to the rights or safety of others." Minn.Stat. § 549.20, subd. 1; see Barr/Nelson, Inc. v. Tonto's, Inc., 336 N.W.2d 46 (Minn.1983); McGuire v. C. & L. Restaurant, Inc., 346 N.W.2d 605, 615 (Minn.1984).

■ The trial court, in its memorandum incorporated into its denial of appellants' post-trial motions, discussed appellants' claim that punitive damages were excessive. The court anticipated an even higher punitive damage award and found the $100,000.00 awarded within reasonable limits. We agree. Based on the jury's findings that MVBA's and Maust's acts showed willful indifference to the Rediskes' rights, the punitive damage award will not be set aside on appellate review. There is evidence to support setting aside the verdict.

■ Appellants argue that without separate interrogatories to the jury on each factor listed in Minn.Stat. § 549.20, subd. 3, there is no way to determine that the punitive damage award was proper. The trial court, in instructing the jury, read 549.20, subd. 3, giving the factors to the jury for consideration. A separate interrogatory for each factor is not necessary.

The punitive damage award is consistent with 549.20, subd. 3, in light of evidence presented to the jury. Maust persuaded respondents, by altering the PCA's cash flow statement, to lease the Slurrystore knowing respondents had been advised by the PCA that they could not afford the Slurrystore.

Maust knew the state of respondent's financial affairs and the effect a disruption in their farming operation would have. Yet he represented that the Slurrystore would be installed in the fall of 1978 and that installation could be completed within ten days. Maust promised respondents financial help should they need it, knowing MVBA had a policy against extending such help.

The damage to the Rediskes was great, culminating in the loss of their farm. In 1978, MVBA had sales of 15 to 20 million dollars. The punitive damage award is less than one percent of appellant's 1978 sales. Considered with the other statutory factors, the award has support in the record.

Appellants raise two other issues on appeal: (1) that the trial court improperly admitted Sandra Rediske's testimony that Mr. White of First National Bank of Mabel did not like Harvestore, thought they were too expensive, and would not finance respondents' purchase of the Slurrystore, and (2) that the trial court improperly admitted testimony of Mr. Hellickson, a former MVBA employee, who burst out on the stand that he terminated his employment with MVBA in July, 1978, because of disagreements with Maust and MVBA's corrupt business ethics.

■ We hold that the trial court did not commit reversible error in admitting this evidence. Appellants argue that Mrs. Rediske never spoke to Mr. White and that her testimony, then, must be based on hearsay. Mrs. Rediske's credibility was evaluated by the jury. Likewise, Mr. Hellickson's outburst was evaluated by the jury in the context of a lengthy trial with substantial charges and counter charges.

## V.

### Summary Judgment

The Rediskes appealed the grant of summary judgment to A.O. Smith and AgriStor dismissing the Rediskes' claims against them. Once MVBA filed its appeal and this court consolidated the two appeals, it became clear to the Rediskes that they could not brief both their own and MVBA's issues in one brief and they petitioned this court for permission to file an enlarged brief. Although this court denied the petition, it suggested in its order that Rediskes use their reply brief to address the summary judgment issues, which the Rediskes did.

MVBA argues that the Rediskes' appeal should be dismissed for failure to brief the issues in their first brief. We acknowledge the Rediskes' right to review of these issues but rule against their appeal on the merits.

■ A motion for summary judgment may be granted if:

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law.

Minn.R.Civ.P. 56.03. The trial court may not decide factual issues on a motion for summary judgment; its sole function is to determine whether fact issues exist. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn. 1981). All doubts and inferences must be resolved against the moving party. *Id.*

When AgriStor attempted to enter the Rediske farm to repossess the Slurrystore following their default, the Rediskes refused to allow them to do so. AgriStor commenced a replevin action in United States District Court for the District of Minnesota and moved for summary judgment on other issues.

A.O. Smith and AgriStor were granted summary judgment prior to trial on the issues of agency. Immediately prior to trial, A.O. Smith and AgriStor filed another motion for summary judgment on counts eight through fourteen of the third amended complaint. These counts included allegations that A.O. Smith and AgriStor failed to deliver the Slurrystore in a timely manner, sold more systems than could be installed, negligently analyzed the Rediskes' credit, made false representations about the Rediskes' financial resources, ratified acts of employees who were unfit, and encouraged the Rediskes to lease knowing they could not afford the payments. Finally, the complaint alleged A.O. Smith was vicariously liable under the doctrine of respondeat superior.

■ The facts needed to decide the motion were not substantially in dispute. The summary judgment issues were questions of law, and the trial court properly granted A.O. Smith and AgriStor's summary judgment motion on those issues.

### DECISION

1. The trial court erred in not submitting the comparative fault or negligence of the parties to the jury.

2. The trial court did not err in excluding testimony of appellants' expert witness disclosed immediately before trial.

3. The evidence was sufficient to justify a finding of fraud.

4. The compensatory and punitive damage awards were not excessive or given under the influence of passion and prejudice.

5. The trial court did not err in granting A.O. Smith's and AgriStor's summary judgment motion.

Affirmed in part, remanded only on the issue of the comparative fault of the parties.