*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0693**

Deborah Meckola,
as Trustee for the Heirs of Jordan Adams, Decedent,
Respondent,

vs.

Thomas J. Rishavy, M.D., et al.,
Appellants.

**Filed April 4, 2016
Affirmed
Schellhas, Judge**

St. Louis County District Court
File No. 69DU-CV-13-317

Robert K. Randall, William M. Fishman, Michael C. Van Berkom, Fishman, Carp, Bescheinen & Van Berkom, Ltd., Plymouth, Minnesota (for respondent)

William M. Hart, Julia J. Nierengarten, Meagher & Geer, P.L.L.P., Minneapolis, Minnesota; and

Tracy A. Schramm, Geraghty, O'Loughlin & Kenney, P.A., Duluth, Minnesota (for appellants)

        Considered and decided by Schellhas, Presiding Judge; Worke, Judge; and Johnson, Judge.

**UNPUBLISHED OPINION**

**SCHELLHAS**, Judge

Following a jury trial on respondent's medical-malpractice wrongful-death claims, appellants seek reversal of a money judgment against them and remand for a new trial. We affirm.

**FACTS**

On April 28, 2010, 17-year-old Jordan Adams sustained burns in a welding accident at his high school and was admitted to SMDC Medical Center in Duluth for treatment. Appellant Thomas J. Rishavy, M.D., a plastic surgeon, was Adams's attending physician at SMDC.[1] Adams's burns were not considered to be life threatening, and his prognosis was good. But Adams died at SMDC on May 12. An autopsy revealed that the immediate cause of death was an undiagnosed endocrine condition called Addison's disease and that an underlying cause of death was Adams's burn trauma, which triggered an Addisonian crisis causing electrolyte abnormalities that stopped Adams's heart.

Respondent Deborah Meckola, Adams's mother and trustee for his heirs, brought medical-malpractice wrongful-death claims against physician-defendants and SMDC. A few weeks before trial, Meckola informed physician-defendants and the district court that she had settled her claims against SMDC and moved to exclude from evidence Adams's prehospitalization medical records. The records document Adams's history of mental-

---

[1] At all material times, Dr. Rishavy was acting within the course and scope of his employment by appellant Northland Plastic Surgery P.A. We therefore refer to Dr. Rishavy and Northland collectively as "physician-defendants."

health issues and indicate that, prior to his burn injury, Adams experienced physical symptoms including high heart rate, low blood pressure, loss of appetite, and weight fluctuations. Dr. Rishavy did not review the records in treating Adams but learned of Adams's preexisting mental-health issues shortly after Adams's admission to SMDC. The court denied Meckola's motion but noted that it would consider at trial any "specific objections regarding specific entries" in the medical records.

On the first day of trial, Meckola informed physician-defendants and the district court that her claims against SMDC had been settled through a *Pierringer* release, and Meckola later stipulated to dismiss her claims against SMDC with prejudice. Meckola's claims against physician-defendants were tried to a jury. During physician-defendants' cross-examination of Meckola's first expert witness, the court sua sponte restricted the use of Adams's prehospitalization medical records; after two of Meckola's expert witnesses testified and were excused, the court expressly ruled that the records were admissible in redacted form. Following the close of evidence, because neither party had referred to or attempted to introduce the records in redacted form, the court ruled: "We can make the . . . record[s] part of the record in terms of appellate issues and give [them] an exhibit number, but I will not be sending [the records] to the jury."

The jury found in favor of Meckola and awarded $508,033.60 in damages. Physician-defendants moved for a new trial, assigning error to the district court's rulings regarding Adams's prehospitalization medical records and to its decision not to submit the question of SMDC's comparative fault to the jury. The court denied physician-defendants' new-trial motion and entered judgment for Meckola.

This appeal follows.

## D E C I S I O N

Physician-defendants argue that the district court committed reversible error in "the fact and manner of" its restriction of the use of Adams's prehospitalization medical records. Physician-defendants also argue that the court committed reversible error by "suppress[ing]" the question of SMDC's comparative fault.

"[Appellate courts] afford the district court broad discretion when ruling on evidentiary matters, and [appellate courts] will not reverse the district court absent an abuse of that discretion." *Doe 136 v. Liebsch*, 872 N.W.2d 875, 879 (Minn. 2015). "By their very nature, evidentiary rules demand a case by case analysis, an analysis best left to the trial judge familiar with the setting of the case." *Id.* (quotations omitted). "But the erroneous exclusion of evidence is grounds for a new trial unless the exclusion was harmless." *Id.*; *see also TC/Am. Monorail, Inc. v. Custom Conveyor Corp.*, 840 N.W.2d 414, 422 (Minn. 2013) ("To be entitled to a new trial based on an improper evidentiary ruling, [a party] must establish prejudice."). "An evidentiary error is prejudicial if it might reasonably have influenced the jury and changed the result of the trial." *TC/Am. Monorail*, 840 N.W.2d at 423 (quotation omitted).

*Prehospitalization medical records*

Physician-defendants argue that the district court committed reversible error in the manner of its restriction of the use of Adams's prehospitalization medical records by "narrow[ing]" the restriction only after two of Meckola's expert witnesses testified and were excused. This argument rests upon a factual assertion—namely, that the court's sua

4

sponte ruling during physician-defendants' cross-examination of Meckola's first expert witness "prohibited [physician-defendants] from using the pre-hospitalization records for any purpose." But the appellate record disproves physician-defendants' assertion.

When physician-defendants began to question Meckola's first expert witness regarding Adams's prehospitalization medical records, the district court halted cross-examination, excluded the jury from the courtroom, and asked physician-defendants to explain the relevance of records not relied upon by Dr. Rishavy in his treatment of Adams. After counsel argued that the records were relevant to the expert witness's credibility, the court ruled that "we're not going to be talking about prior unrelated *physical* findings that [Dr. Rishavy] did not rely upon in the treatment of [Adams]." (Emphasis added.) In reaching its ruling, the court noted that Dr. Rishavy had been aware of Adams's preexisting mental-health issues and stated, "How that plays into the case, we'll let the attorneys inquire and have at it with respect to that." The court's ruling did not prohibit the use of Adams's prehospitalization medical records for *any* purpose. Instead, the court restricted the use of the prehospitalization medical records to records regarding Adams's mental health. The court later confirmed, rather than narrowed, that ruling when it stated:

> [A]ny information relative to [Adams's mental-health issues] . . . are fair game for [physician-defendants] and any records that deal with those [issues] directly are fair game and may be part of the medical record that goes to the jury in this case, but those records that deal with prior physical symptoms that are identical or similar to the ones observed in this case would not be relevant because [Dr. Rishavy] did not rely upon them, and so we are going to have to redact the records to make sure that doesn't happen.

5

We conclude that the court did not err in the manner of its restriction of the use of the prehospitalization medical records.

Physician-defendants argue that they were entitled to unrestricted use of Adams's prehospitalization medical records "to challenge the credibility of [Meckola]'s experts by showing that the factual basis for their opinions—that [Adams] was, 'by history,' a normal, healthy 17-year-old boy whose symptoms should have been considered unusual and alarming—was flawed." According to physician-defendants, Adams's "history of eating issues, rapid fluctuations in his weight, incidents of low blood pressure and high heart rate, and vomiting associated with anxiety" undermined the credibility of Meckola's experts, whose testimony purportedly supported a theory that "Adams was a healthy, normal, and active 17-year-old who exhibited new, uncommon, and alarming physical symptoms." But our close examination of the testimony of Meckola's three expert witnesses shows that none of the witnesses testified that Adams was healthy prior to his hospitalization or that his physical symptoms did not predate his hospitalization. Instead, the witnesses testified about the appearance and progression of Adams's physical symptoms *during* the hospitalization and about the typicality of those physical symptoms in patients *like* Adams. We therefore conclude that Adams's prehospitalization medical records had limited, if any, relevance to the credibility of Meckola's experts.

Even if physician-defendants were entitled to unrestricted use of Adams's prehospitalization medical records to cross-examine Meckola's expert witnesses, physician-defendants have failed to establish prejudice by showing that unrestricted use "might reasonably have influenced the jury and changed the result of the trial." *TC/Am.*

6

*Monorail*, 840 N.W.2d at 423 (quotation omitted). Dr. Rishavy testified that he did not remember using differential diagnosis when treating Adams and that he may not have reviewed Adams's hospital chart each time that he saw him. Meckola presented expert testimony that Dr. Rishavy departed from the standard of care by failing to perform differential diagnoses on Adams; failing to properly review Adams's chart; failing to order electrolyte testing on or before May 9, 2010; and failing to consult with a pediatric intensivist prior to May 12. Indeed, Dr. Rishavy's own expert witness testified that Dr. Rishavy departed from the standard of care by failing to perform differential diagnoses on Adams and failing to properly review Adams's chart. And each of Meckola's experts testified that one or more of Dr. Rishavy's departures from the standard of care caused or contributed to Adams's death. In light of the overwhelming evidence of their liability for Adams's death, we conclude that physician-defendants are not entitled to a new trial on the grounds that the district court erroneously restricted physician-defendants' use of the prehospitalization medical records in cross-examining Adams's experts. *See Hendrickson v. Magney Constr. Co.*, 402 N.W.2d 194, 196 (Minn. App. 1987) (stating that "if [erroneously excluded] evidence or testimony is only collateral and not material to the main issues, a new trial is not warranted" (citing *Newton v. Minneapolis St. Ry. Co.*, 186 Minn. 439, 445, 243 N.W. 684, 687 (1932))); *cf. Becker v. Mayo Found.*, 737 N.W.2d 200, 214 (Minn. 2007) ("Where a case is close on the facts, rejection of competent and material evidence is reversible error." (quotation omitted)).

Physician-defendants alternatively argue that Dr. Rishavy testified about why he exercised his medical judgment as he did and that he should have been permitted to

affirmatively use the prehospitalization medical records to show that Adams's medical history corroborated the reasonableness of Dr. Rishavy's conclusions. In other words, physician-defendants claim that Adams's prehospitalization medical records "corroborated the reasonableness of [Dr. Rishavy's] judgment" that Adams's physical symptoms during his hospitalization were caused by the combination of his burn injuries and his preexisting mental-health issues. But physician-defendants did not make an affirmative-use argument below, instead insisting that the records were relevant to the credibility of Meckola's experts and unequivocally stating that the records "d[id]n't factor into [Dr. Rishavy's] treatment of [Adams]." We therefore do not consider physician-defendants' affirmative-use argument on appeal. *See Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 633 (Minn. 2013) ("Generally, a party may not obtain review by raising the same general issue litigated below but under a different theory." (quotation omitted)).

Even if we were inclined to consider physician-defendants' affirmative-use argument, the absence of the prehospitalization medical records from the appellate record prevents us from determining whether the records contain otherwise-admissible evidence that physician-defendants could have used to refute evidence of Dr. Rishavy's departures from the standard of care. Such absence is inexplicable in light of the district court's express invitation to place the prehospitalization medical records in the appellate record. The absence of the prehospitalization medical records from the record before us provides an independent reason for our decision not to consider physician-defendants' affirmative-use argument. *See Custom Farm Servs., Inc. v. Collins*, 306 Minn. 571, 572, 238 N.W.2d 608, 609 (1976) ("An appellant has the burden of providing an adequate record for appeal.

8

Error cannot be presumed."). We conclude that the district court did not abuse its discretion by restricting the use of Adams's prehospitalization medical records.

*Comparative fault*

Physician-defendants argue that, because Meckola settled her claims against SMDC by way of a *Pierringer* release, they had a right to attempt to establish SMDC's comparative fault in Adams's death. We agree that physician-defendants could have pursued a comparative-fault strategy by presenting evidence of SMDC's negligence and requesting a jury determination on SMDC's comparative fault. *See Frey v. Snelgrove*, 269 N.W.2d 918, 923 (Minn. 1978) ("If there is evidence of conduct which, if believed by the jury, would constitute negligence (or fault) on the part of [the settling defendants], the fault or negligence of th[e settling defendants] should be submitted to the jury." (quotation omitted)); *Rediske v. Minn. Valley Breeder's Ass'n*, 374 N.W.2d 745, 749 (Minn. App. 1985) ("Here, where the record reveals a demand by [nonsettling defendants'] counsel for submission of [settling defendant's] . . . fault to the jury, the trial court erred in not submitting the question to the jury. There was an arguable basis to submit comparative fault of any party: the trial court should not have denied [nonsettling defendants'] request."), *review granted* (Minn. Dec. 11, 1985) *and appeal dismissed* (Minn. May 15, 1986). But physician-defendants did not pursue such a strategy.

The record reflects that, prior to learning of Meckola's settlement with SMDC, physician-defendants filed proposed jury instructions that included an instruction on comparative fault; they also filed a proposed special-verdict form that included questions

9

regarding SMDC's comparative fault. At a subsequent pretrial hearing, the district court stated:

> It's my understanding . . . that the case relative to [SMDC] . . . has been dismissed by settlement. The issue of how we submit negligence malpractice type issues to the jury with respect to [SMDC] I think still remains open for discussion, but that's not an issue before the Court right at this point in time. *I think it's at least included in [physician-defendants'] proposed jury forms.*

(Emphasis added.) But in its introductory remarks to the jury on the first day of trial, the court identified only physician-defendants as "the parties being sued by [Meckola] in this case."

At the end of the second day of trial, the court referred to off-the-record "discussions about whether or not SMDC should remain on the caption and also be part of a comparative fault analysis" and stated, "I'm not sure I can couch it in terms of [counsel for physician-defendants] agreeing that [SMDC] should not be on the jury verdict form or on the caption, but she didn't raise any strenuous objection when we discussed it in chambers." Counsel for physician-defendants acknowledged that she had filed the proposed jury instructions and special-verdict form prior to finalization of the settlement between Meckola and SMDC, and she stated unequivocally that "as long as SMDC . . . is not going to be listed in the caption, then [physician-defendants] do not object to not having SMDC on the verdict form." With no objection by physician-defendants, the court then ruled that SMDC would "not be included" in the jury instructions or on the verdict form.

Following the close of evidence and discussion with counsel, the district court stated:

10

> [O]ff the record we had about a half hour session where we went through the instructions. I got insight from both sides on particular instructions, told both counsel what I would do in terms of rulings, but did indicate that we would go back on the record, preserve any objections, thoughts, clarifications for the record.

Physician-defendants did not raise the comparative-fault issue. The court did not instruct the jury on comparative fault, and physician-defendants did not object. Nor did physicians-defendants object to the special-verdict form, which did not include questions regarding SMDC's comparative fault. We conclude that physician-defendants abandoned any initial request for a jury determination on SMDC's comparative fault and thereby forfeited their right to such a determination. *Cf. Fire Ins. Exch. v. Adamson Motors*, 514 N.W.2d 807, 810 (Minn. App. 1994) ("Normally, the trial court should submit to the jury the fault of all parties, including that of settling defendants. The failure to do so does not constitute error, however, if the rights of all parties are protected and the adversarial process preserved. [Nonsettling defendant] did not seek apportionment of any fault against [settling defendant] and cannot be heard to complain of that failure now." (citations omitted)).

Physician-defendants attempt to avoid forfeiture by asserting that, *off* the record, "[t]he [district] court ruled preemptively, before trial started, that [they] would be precluded from attempting to prove SMDC's comparative fault." We are not persuaded. The record reflects that, on the first of two opportunities to state for the record physician-defendants' position on the comparative-fault issue, counsel for physician-defendants conceded, "[A]s long as SMDC . . . is not going to be listed in the caption, then [physician-defendants] do not object to not having SMDC on the verdict form." And on the second

11

opportunity, counsel for physician-defendants made no mention of the comparative-fault issue when asked to "preserve any objections, thoughts, clarifications for the record." Physician-defendants did not make an adequate record of the ruling that they now claim explains their decision not to seek a jury determination on SMDC's comparative fault. We therefore reject that claim.

**Affirmed.**