**ADVANCED MEDICAL, INC.**

**v.**

**ARDEN MEDICAL SYSTEMS, INC., Ortho Diagnostic Systems, Inc. and Johnson & Johnson and Johnson & Johnson Professional Diagnostics, Inc., Appellants.**

No. 90–1745.

United States Court of Appeals,
Third Circuit.

Argued March 5, 1991.

Decided Jan. 29, 1992.

Arlin M. Adams (argued), Alan M. Lieberman, Carl A. Solano, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellants.

Lee A. Rosengard (argued), Jeffrey A. Lutsky, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellee.

Before: BECKER, NYGAARD and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Following a jury trial in the district court for the Eastern District of Pennsylvania on claims of breach of contract and intentional interference with contractual relations, plaintiff Advanced Medical, Inc. ("Advanced"), a medical products distributor, won a large compensatory damages verdict against four defendants: Arden Medical Systems, Inc. ("Arden"), a manufacturer of medical technology; Ortho Diagnostic Systems, Inc. ("Ortho"), a distributor of medical products; Johnson & Johnson, Inc. ("Johnson & Johnson"), Ortho's parent and the subsequent owner of Arden; and Johnson & Johnson Professional Diagnostics, Inc. ("JJPD"), a Johnson & Johnson subsidiary. Advanced was also awarded a huge punitive damages against the latter three defendants ("the Johnson & Johnson defendants"). The trial concerned Advanced's claim that Arden had breached their distribution agreement and that the Johnson and Johnson defendants had encouraged the breach by subterfuge and deceit. Defendants now appeal and allege numerous trial errors including (1) misapplication of the parol evidence rule, (2) faulty instruction of the jury on mitigation of damages, and (3) improper molding of the jury verdict. For

the reasons that follow, we will reverse the judgment of the district court and remand for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

During the early 1980s, Arden invented and manufactured a desk-top machine that could rapidly perform clinical blood chemistry profiles. Arden called the machine the ChemPro 1000 Clinical Chemistry Analyzer ("ChemPro 1000") and marketed it to physicians and clinics through a California company named Circadian, Inc. ("Circadian").

In 1986, Arden commenced discussions with other independent medical distributors to market the ChemPro 1000 nationwide to other health care providers, notably hospitals. Among the distributors approached was Advanced, a distributor of high-tech medical products. The two companies entered into negotiations, which were principally conducted by Advanced's president and sole shareholder, John T. Sasso, and by Arden's national sales manager, Ronald L. Drylie, both of whom were experienced businessmen. The negotiations stalled for some period over the degree to which Advanced would be made the "exclusive" distributor of the ChemPro 1000 in its designated territory (Pennsylvania, New Jersey, New York, and Delaware).[1] On October 29, 1986, Advanced and Arden, apparently satisfied, entered into a standard form Dealership Agreement ("the Agreement"), which was tailored somewhat to reflect the parties' negotiations. The term of the Agreement was three years.

Arden's co-founder and president, Dr. Mark Knudson, was contemporaneously engaged in negotiations with Ortho, which was interested in buying Arden and entering the clinical blood chemistry market. Ortho's parent, Johnson & Johnson, ultimately agreed to acquire Arden. On December 7, 1986, the day before the scheduled signing and public announcement of

its acquisition of Arden, Johnson & Johnson learned that Arden had entered into "exclusive" distribution agreements with Advanced and thirteen other distributors. Johnson & Johnson's attorneys thereupon drafted a last-minute addendum to the merger documents which required Arden's co-founders, Knudson and Walter Sembrowich, to use their best efforts "to terminate or make nonexclusive" these pre-existing distribution agreements. The addendum also specified that the future compensation of those Arden officers who remained after the merger could be reduced to offset the costs of terminating or making nonexclusive the distribution agreements. On December 29, 1986, Johnson & Johnson acquired Arden for $24,400,000 and made Arden its wholly owned subsidiary.

From this point, the parties' versions of the facts differ markedly. The record, read in the light most favorable to the verdict winner, suggests that after acquiring Arden, Johnson & Johnson wanted the ChemPro 1000 marketed nationally by Ortho and by JJPD, a newly-created subsidiary of Johnson & Johnson. Ortho was to concentrate on sales of the ChemPro 1000 to hospitals, while JJPD, through its own sales force and a network of nonexclusive subdistributors, would concentrate on sales to the remainder of the market, particularly physicians' offices. Johnson & Johnson, Arden, Ortho, and JJPD targeted April 1, 1987, as the date by which Arden's prior distribution agreements were to be terminated or rendered nonexclusive and the new marketing network was to be in place. Pursuant to this plan, Arden succeeded between January and April, 1987 in negotiating settlements terminating all its prior distribution agreements except for the Agreement with Advanced.

According to Advanced's version of events, because its "exclusive" rights under the Agreement were far more valuable, and hence more costly to buy out than those of the other distributors,[2] the John-

---

1. The record reflects that this four-state region contains roughly twenty percent of all hospital beds and physicians in the United States.

2. An internal document prepared by Arden employees estimated that the value of the Agreement with Advanced was $2,140,593, and that settlement value of the Agreement was $1,300,000. Except for one other distribution agree-

son & Johnson defendants employed a variety of "hardball" tactics to force Advanced out of the Agreement without compensation. Specifically, the hardball strategy included the following:

(1) Undercutting Advanced's sales of the ChemPro 1000 by marketing a nearly identical, but less expensive machine, the ChemPro 500, which was not made available to Advanced;

(2) Selling the ChemPro 1000 and ChemPro 500 to medical supply houses—which Advanced terms "alternate site distributors"—which in turn resold the analyzers to physicians' offices in Advanced's four-state region; and

(3) Redirecting the attention of Arden's regional managers away from providing support to Advanced's sales staff and towards establishing an Ortho/JJPD marketing network.

In the wake of these actions by the Johnson & Johnson defendants, relations between the parties deteriorated. In March 1987, Steven Bush, Arden's Vice President of Sales & Marketing, and James Hobbs, Ortho's Director of Alternate Site Testing, met with Sasso in an apparent attempt to resolve the impasse. According to Sasso, Hobbs repeatedly during this meeting promised him that regional sales manager support would be restored and that the defendants had every intention of honoring Advanced's distributorship rights under the Agreement. In Sasso's view, Hobbs lied. After the meeting, Hobbs's tune changed dramatically. According to Bush's trial testimony, Hobbs told him shortly after the meeting that they would forcibly drive Advanced out of the contract. Bush testified that Hobbs stated:

[I]t was obvious that Advanced Medical was going to be a hard one to terminate and that they weren't going to go easily and that if they tried to fool with Johnson & Johnson, they would crush [Sasso].

Advanced characterizes this statement as evidence of the hardball strategy.

ment, Bimeco's, which held roughly the same value as Advanced's, the other agreements were

Despite the assurances proffered during the meeting, relations continued to deteriorate. According to Advanced, events culminated on March 31, 1987, when Arden's regional sales manager, William Ovecka, informed an Advanced salesman during a phone conversation that he could not provide sales assistance any longer because Advanced had been terminated as a distributor of the ChemPro 1000.

On May 21, 1987, Advanced filed the present complaint asserting jurisdiction on both diversity of citizenship and federal question grounds. The complaint charged the defendants with breach of contract, tortious interference with existing and prospective contractual relations, violations of the Sherman and Robinson–Patman Acts and the civil RICO statute, conspiracy, unfair competition, and fraudulent inducement to enter into the contract. By the time of trial, Advanced had abandoned or the court had disposed of by summary judgment all claims except those for breach of contract, tortious interference, and civil RICO. During trial, the RICO counts charging tortious interference with prospective business relations and civil RICO violations were eliminated on a motion for directed verdict.

At trial, Advanced attempted to demonstrate that the defendants had engaged in the hardball tactics described above to force Advanced out of the Agreement. Advanced argued that these tactics constituted breaches of the written terms of the Agreement and, to the extent that the written terms did not legally reflect the drafters' discussions and understandings, constituted breaches of the oral agreement initially negotiated between Arden and Advanced. To this end, Advanced presented the testimony not only of its president, Sasso, but also of Arden's former national sales manager Drylie, who had had a falling out with the defendants. Drylie corroborated Sasso's account of the specifics of the initial Agreement and the ways in which the defendants' post-merger activities had breached the Agreement.

each valued at less than $242,343 and their settlement value at less than $40,000.

The defendants, while not seriously denying that they had engaged in the so-called hardball tactics, strenuously denied that any of the tactics constituted a breach of the *express* terms of the Agreement. Rather, they argued that Advanced was attempting to vary the clear terms of the integrated and written Agreement by introducing inadmissible parol evidence of prior, inconsistent oral understandings, including evidence related to agreements that Advanced had made with Arden about rights to distribution that were left out of the written agreement. The defendants moved *in limine,* and at several points during the trial, to bar all such parol evidence. The district court reserved decision on the motion but ultimately admitted the evidence. Near the end of the trial, the court explained its view that the contract was ambiguous and that parol evidence clarifying the relevant terms of the Agreement had been properly admitted.

Other questions concerning the admission of evidence also arose at trial. At one point during the direct examination of Arden's Bush, Advanced's attorney elicited testimony regarding the comment by Ortho's Hobbs that "they would crush [Sasso]," which, according to Bush, Hobbs made following the March meeting between Sasso, Hobbs, and Bush. During cross-examination of Bush, defendants' counsel made reference to the "crush" statement, but failed to probe further the substance of the post-meeting conversation between Bush and Hobbs. During the later direct examination of Hobbs, however, defendants' counsel began to elicit testimony from Hobbs regarding what Bush had told him about Advanced immediately before his alleged "crush" threat. Specifically, Hobbs began to testify that Bush had told him that Advanced had a history of litigiousness in its relations with other manufacturers. Defendants' proffer was that such evidence would explain and nullify the impact of the crush statement by suggesting that Ortho and Johnson & Johnson would crush Advanced in litigation.

After Advanced's counsel objected, the district court ruled that Hobbs could not testify about what Bush had told him be-cause it was hearsay. The district court admonished the jury to disregard what it had heard prior to the objection. Defense counsel then proceeded with direct examination of Hobbs, carefully avoiding questions about what Bush had said prior to Hobbs's "crush" statement. During that examination, however, defense counsel did ask Hobbs whether he had "ever state[d] to Steven Bush or anyone else that you or Johnson & Johnson would crush Advanced Medical?" Hobbs responded, "Never."

Advanced also presented expert testimony regarding the measure of compensatory damages. The assumption undergirding this testimony was that Advanced had been terminated wrongfully roughly six months into its three-year distributorship Agreement. In calculating Advanced's measure of damages, the expert included both lost profits resulting from the defendants' breaches prior to termination, and estimated lost profits for the two and one-half years following termination, the balance of the three-year contract term.

In response to this testimony, the defendants sought to establish that Advanced had not attempted to sell the twenty or so ChemPro 1000 units it had warehoused at the time of termination. Moreover, the defendants tried to establish that Advanced had not attempted to secure the rights to distribute other blood analyzers on the market, the existence and characteristics of which the defendants documented extensively. In defendants' view, this demonstrated that Advanced had failed to attempt to mitigate its damages after termination. Consistent with this submission, the defendants timely and in proper form requested that the jury charge include language highlighting Advanced's duty to mitigate its damages. The district court declined to give such a charge and concluded as a matter of law that Advanced was a "lost volume seller" which could never mitigate its losses by buying and distributing blood analyzers through another manufacturer. In the court's view, even if Advanced had obtained the rights to sell other medical products, it could never have miti-

gated the damages flowing from its inability to sell ChemPro 1000s.

The defendants moved for a directed verdict on punitive damages, and argued that Advanced had failed to submit evidence that the Johnson and Johnson defendants' conduct was sufficiently outrageous to support a punitive damages award under Pennsylvania law. The court denied the motion.

The case was submitted to the jury on special interrogatories which tracked the breach of contract claim against Arden and the tortious interference claim against the Johnson & Johnson defendants. The jury returned a verdict for Advanced of $181,-250 in compensatory damages against Arden for breach of contract. It also returned a verdict of $543,750 in compensatory damages against Johnson & Johnson, Ortho, and JJPD for tortious interference with contract. Finally, the jury awarded Advanced punitive damages in the amount of $7,150,000 against the Johnson & Johnson defendants. The court entered judgment accordingly.

The defendants filed post-trial motions for judgment notwithstanding the verdict, or, in the alternative, for a new trial, raising, *inter alia*, the arguments now presented on appeal. The district court rejected all these arguments and denied the motions. The defendants also filed a Rule 59(e) motion to amend the judgment, arguing that Pennsylvania law does not permit damages for tortious interference with contract to exceed the damages awarded for the breach of contract and that therefore the compensatory damage award against Johnson & Johnson, Ortho, and JJPD should be reduced from $543,750 to $181,-250. The district court denied this motion and noted that the $543,750 tort verdict against the three defendants was exactly three times the $181,250 verdict against Arden. The court opined that, in all likelihood, the jury simply meant to apportion the total of $725,000 in compensatory damages equally among the four defendants. In order to effectuate the jury's perceived intent, the district court *sua sponte* modified the separate breach of contract and tort awards from $181,250 and $543,750,

respectively, to a single award of $725,000 for both the contract and tort claims.

The district court also conducted a subsequent evidentiary hearing on Advanced's fee petition and held that Advanced was entitled to reasonable attorneys' fees, costs, and expenses in the amount of $819,-055.38.

The defendants timely appealed from the final judgment, the denial of post-trial motions, and the award of attorneys' fees. We have jurisdiction under 28 U.S.C. § 1291.

## II. THE PAROL EVIDENCE ISSUES

### A. *Introduction*

The defendants argue that "the most significant series of errors of the trial" occurred when the district court permitted Advanced to introduce parol evidence concerning pre-contractual oral discussions and agreements. The defendants contend that this evidence varied and rewrote the written Arden–Advanced Agreement, particularly the portion of the contract that defined those markets into which Advanced could sell exclusively.

At trial, the parties' dispute centered on three theories of contract breach, each of which was bolstered by the admission of evidence arguably in tension with the express terms of the Agreement. Plaintiff's first theory of breach derived from defendants' alleged failure to provide sales support services guaranteed by the contract. Paragraph 9(b) of the Agreement obligated Arden to:

> furnish Distributor with such sales and promotional materials, technical data, instructional materials and staff training as is reasonably necessary or appropriate to facilitate sale of the Products to customers.

Plaintiff introduced evidence about the disparate level of support that defendants provided prior to and after the defendants' decision to seek termination of the Agreement, and argued that the failure to provide the same level of support after the termination decision constituted a breach of contract. Plaintiff also introduced evi-

dence that a subsequent oral agreement arose between Advanced and the defendants that obligated the defendants to provide regional sales manager support. Defendants argue that such evidence was inadmissible because it varied the contract's terms by imposing additional support obligations on the defendants.

Second, defendants argue that the district court erroneously admitted Advanced's evidence that the defendants had marketed the ChemPro 500 as a substitute for the ChemPro 1000 to undermine Advanced's right under the contract to distribute the the ChemPro 1000. Plaintiff suggested at trial that this constituted breach because defendants were marketing the ChemPro 500 in markets that were exclusive to Advanced under the contract. Defendants argue that admission of the evidence related to the ChemPro 500 was error because the contract only guaranteed exclusive rights to distribute the ChemPro 1000 and not the ChemPro 500.

Finally, the jury heard evidence of an oral understanding that granted Advanced the exclusive right to distribute the ChemPro 1000 to *all* users within the defined geographic territory. Paragraph 3 of the Agreement defined the geographic area and the markets to which Advanced could sell as follows:

3. *Territory*

The territory hereby assigned to Distributor shall include the geographic area or areas described in attached Schedule B (the "Territory"). Such Territory shall be exclusive to Distributor, and the Company agrees that Distributor shall have the exclusive right to sell or lease the Products within said Territory during the term of the Agreement; provided, however, that the Company may sell Products directly or through other outlets to particular customers within the Territory if: (i) Distributor is unable or unwilling to sell and service such customers, or (ii) the customer refuses to do business with Distributor. Territory shall be exclusive to (a) hospitals (b) home health care (c) nursing homes (d) emergency centers (e) surgicenter but not exclusive in physician offices or clinics.

As the above excerpt suggests, the Agreement explicitly stated that Advanced had exclusive rights to distribute the ChemPro 1000 to some purchasers (hospitals, home health care facilities, nursing homes, and emergency centers), but lacked exclusive rights to distribute the product to physicians' offices and clinics. Nonetheless, the district court admitted two pieces of evidence in support of plaintiff's theory that it had near-exclusive rights to distribute the ChemPro 1000 even to physicians' offices and clinics.

First, Advanced proffered evidence that the "not exclusive" language had been inserted in the contract in 1986 only because Arden at that time had an operative contract with a prior distributor, Circadian, to distribute to physicians' offices and clinics. Advanced argued that the Agreement meant that it enjoyed the exclusive right to distribute the ChemPro 1000 to all markets within its territory, except for Circadian's right to distribute to physicians' offices and clinics for the lifetime of Circadian's contract with Arden, which expired at the end of 1986.

Second, Advanced presented evidence of the parties' pre-contract understanding that Advanced enjoyed exclusive rights to sell to all "alternate site distributors" in the four-state area, regardless to whom the alternate site distributors ultimately resold the product. The term "alternate site distributors," apparently a synonym for subdistributors, does not appear in the Agreement, and, indeed, Paragraph 3 of the Agreement defined Advanced's rights as "exclusive" or "not exclusive" only according to the identity of the end user to which the ChemPro 1000 was sold. Nonetheless, Advanced contended that it enjoyed exclusive rights to distribute to the alternate site distributors or dealers even if these subdistributors purchased ChemPro 1000 units for resale to physicians' offices and clinics. Advanced was permitted to argue that Arden breached this purported parol understanding by selling to such subdistributors for resale to physicians' offices, even though the contract made those markets "not exclusive" to Advanced.

We analyze each of these four pieces of evidence separately and consider whether they were admitted in violation of the parol evidence rule and whether the erroneous admission of any of them necessitates a new trial. We begin, however, with a general review of the parol evidence rule in its Minnesota incarnation, since Minnesota law governs under paragraph 15 of the Arden–Advanced Agreement.

### B. The Minnesota Parol Evidence Jurisprudence

■ Minnesota recognizes the parol evidence rule in its traditional form: "When parties reduce their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement." *LeNeave v. North American Life Assurance Co.*, 854 F.2d 317, 320 (8th Cir. 1988) (quoting *Flynn v. Sawyer*, 272 N.W.2d 904, 907–08 (Minn.1978)). Despite its name, the parol evidence rule is not a discretionary rule of evidence, but rather an element of substantive contract law. See *Karger v. Wangerin*, 230 Minn. 110, 40 N.W.2d 846, 849 (1950). The rule is designed to facilitate commerce by enabling contracting parties to rely on the written word to define their rights and obligations. The Minnesota courts have recognized the commercial benefits that flow from the rule:

> Were it otherwise, written contracts would be enforced, not according to the plain effect of their language, but pursuant to the story of their negotiation as told by the litigant having at the time being the greater power of persuading the trier of fact.... Without [the parol evidence] rule there would be no assurance of the enforceability of a written contract. If such assurance were removed today from our law, general disaster would result, because of the consequent destruction of confidence, for the

tremendous but closely adjusted machinery of modern business cannot function at all without confidence in the enforceability of contracts.

*Cargill Commission Co. v. Swartwood*, 159 Minn. 1, 198 N.W. 536, 538 (1924). Although the rule applies to all written agreements, its force is even more pronounced in cases such as this where the agreement contains an integration clause stating that it "constitutes the complete understanding and contract between the parties with respect to the subject matter thereof." [3] See *Taylor v. More*, 195 Minn. 448, 263 N.W. 537, 539–40 (1935).

■ As with most rules, however, the parol evidence rule has its exceptions. Of particular relevance to the instant dispute, Minnesota recognizes that "parol evidence is admissible when the written agreement is *incomplete* or *ambiguous* to explain meaning of its terms." *Nord v. Herreid*, 305 N.W.2d 337, 340 (Minn.1981) (emphasis added). With these principles in mind, we consider the admission of the four pieces of evidence that defendants contend are inadmissible parol evidence.

### C. Regional Manager/Sales Support

The defendants' first parol evidence objection arises from paragraph 9 of the Agreement, which details Arden's ongoing obligations to support Advanced's sales efforts. That provision reads in full:

*Additional Obligation of the Company*

(a) The Company agrees to exert its best efforts to fill Distributor's orders for the Products in accordance with terms of such order.

(b) The Company shall at its expense furnish Distributor with such sales and promotional materials, technical data, instructional materials and staff training as is reasonably necessary or appropriate to facilitate sale of Products to customers.

---

**3.** The integration clause contained in Paragraph 16 of the Agreement provides:

> *Entire Agreement; Modification and Waiver*
> This Agreement, together with the Schedules attached hereto, constitutes the complete understanding and contract between the parties with respect to the subject matter thereof.

The parties shall not be bound by any purported recision [sic], addition, modification or waiver of any provision hereof, or any purported waiver of any breach hereof by a party, unless such recision [sic], addition, modification or waiver is set forth in writing signed by an authorized officer of each party.

(c) The Company shall promptly notify Distributor of potential customer leads for the Products within the Territory of which the Company becomes aware.

Advanced presented uncontradicted evidence that the defendants had ordered Arden's regional sales managers, who traditionally had provided sales support to independent distributors such as Advanced, to stop returning phone calls from Advanced's employees, to refuse to accompany them on sales calls, and generally to cease supporting Advanced's sales activities. These actions, Advanced argues, violated the express obligations imposed on Arden under paragraph 9, in particular subparagraph (b).

The defendants characterize the issue a bit differently. At most, they argue, the express terms of paragraph 9 require that *someone* at Arden provide sales support to Advanced. But contrary to this clear language, defendants submit, Advanced was permitted to introduce evidence at trial that the parties agreed that a *regional sales manager* would always be provided to support sales. In the defendants' view, such testimony constituted an inadmissible parol addition to the written Agreement.

A review of the record demonstrates that the defendants have mischaracterized the trial testimony. Nowhere does Advanced argue that, contrary to the language of the Agreement, the parties' parol understandings required that Arden always provide a regional sales manager to support Advanced in the ways described by paragraph 9. Advanced simply sought to present evidence that the regional sales managers previously had provided sales support, that they were ordered to stop, and that, in violation of Paragraph 9, no one else employed by defendant filled the gap. In short, Advanced's evidence was intended to demonstrate only that the defendants had violated the *express* terms of the Agreement. Thus, we are satisfied that this issue should not be characterized as implicating the parol evidence rule.

### D. *The ChemPro 500 Claim*

Advanced also argued at trial that a major component of the defendants' scheme to force Advanced to relinquish its distribution rights under the Agreement was the introduction of the ChemPro 500, defendants' subsequent sale of that product within Advanced's territory at prices up to one-third lower than the price of the ChemPro 1000, and defendants' refusal to make the ChemPro 500 available to Advanced. Advanced argues that by marketing the ChemPro 500, the defendants violated the language in paragraph 3 that the "Distributor shall have the exclusive right to sell or lease *the Products* within said Territory."

Defendants counter that paragraph 2 of the Agreement defines "Products" as "those described on attached Schedule A, together with such other products as may from time to time be included herein by mutual written agreement of the parties." Schedule A, in turn, lists only one product, the "ChemPro 1000 Clinical Chemistry Analyzer." Reading paragraphs 2 and 3 and Schedule A in tandem, and noting the undisputed fact that the parties never added other products to the Agreement by "mutual written agreement," the defendants argue that the Agreement simply does not require that the ChemPro 500 be made available to Advanced. They therefore object to the fact that, notwithstanding the plain terms of the Agreement, Advanced was able to introduce parol evidence at trial to the effect that the parties' unwritten agreement was that Advanced would have a right to distribute all new products developed and marketed by Arden, including the ChemPro 500.

We believe that defendants have mischaracterized the record on this point. Advanced did not argue at trial that, despite the language of the Agreement, it had a parol understanding that it could distribute all new Arden products. What Advanced argued was that the ChemPro 500 was *not* a new product, but rather that it was the ChemPro 1000 with a few minor cosmetic changes. In furtherance of this theory, Advanced presented evidence that the ChemPro 500 and ChemPro 1000 were virtually identical, and that the former was deliberately engineered to enable the defen-

dants to circumvent Advanced's right to sell the ChemPro 1000. Thus understood, Advanced's argument did not rely on parol evidence. To the contrary, Advanced's argument called upon the jury, quite properly, to decide whether the introduction of the ChemPro 500 was merely a subterfuge designed to frustrate and avoid the *express* terms of the Agreement. We therefore also reject defendant's parol evidence objection about the ChemPro 500.

### E. *Advanced's Claim of Exclusivity as to Physicians and Clinics*

■ Defendants' two remaining parol evidence objections focus on evidence admitted at trial that allegedly contradicts Paragraph 3 of the Agreement. The final sentence of Paragraph 3 states that Advanced's "[t]erritory shall be exclusive to (a) hospitals (b) home health care (c) nursing homes (d) emergency centers (e) surgicenter *but not exclusive in physician offices or clinics.*" (emphasis added). The defendants contend that a plain reading of this sentence unmistakably demonstrates that, in contrast to the medical providers mentioned in subsections (a)–(d), physicians' offices and clinics were not exclusive markets for Advanced. Thus, the defendants claim, they were free to sell into these markets.

Advanced claimed at trial that an understanding regarding sales to physicians and clinics emerged during the negotiations between Sasso and Drylie that, although perhaps not explicitly reflected in the Agreement, governed the parties' rights. Advanced submitted that Arden agreed to make Advanced its exclusive distributor to *all* medical providers in the relevant four-state area, including physicians and clinics. At the time of the negotiations, however, Arden had roughly two months remaining in its distributorship agreement with Circadian, which gave Circadian rights to distribute the ChemPro 1000 to physicians and clinics. Hence, Advanced explained, it was necessary to draft the Agreement to reflect that Advanced did not, at that time, have exclusive rights in the physician and clinic markets.

Advanced submitted at trial that Arden did not intend to renew the agreement with Circadian after it expired. Advanced argued further, and presented testimony by both Sasso and Drylie to this effect, that the parties' intention was that Advanced would acquire exclusive rights as to physicians and clinics, in addition to the other enumerated end users, upon the expiration of the agreement with Circadian. Advanced now concedes, however, that the Agreement does not mention Circadian, and that it does not in any other way suggest that Advanced's non-exclusive rights to physicians and clinics would somehow become exclusive at a later date.

Although we intimate no view about the accuracy of Advanced's version of the negotiations, we are nonetheless compelled to conclude that the district court erred in admitting evidence relating to the parties' pre-contractual understandings about this issue. There simply is nothing incomplete or ambiguous about the language of the Agreement as it relates to non-exclusivity in the physician offices and clinics market. The Agreement states simply but clearly that the Territory is "not exclusive in physician offices or clinics." There is nothing in the Agreement that acknowledges the existence of Circadian or suggests that the termination of its contract would alter the Agreement between Advanced and Arden. Nor does anything suggest that the "not exclusive" language is limited to Circadian. We thus hold that it was error to admit parol evidence to this effect.

### F. *Exclusivity of Advanced as to Alternative Site Distributors*

■ As we have already explained, Paragraph 3 of the Agreement defines Advanced's exclusive and non-exclusive markets solely in terms of what may be termed "end users" or "medical care providers" (i.e., hospitals, home health care, nursing homes, emergency centers, surgicenters, physicians' offices, and clinics). The Agreement says nothing, however, about sales to non-end users, such as wholesalers, medical supply houses, or other distributors and middlemen that competed with

Advanced. In the absence of clear contractual language on this point, the district court permitted Advanced to argue at trial that the parties had agreed that such middlemen (i.e., the alternate site distributors) also would be exclusive to Advanced. The district court further permitted Advanced to introduce evidence that, before termination of the Agreement, the defendants had sold ChemPro 1000s to at least three medical supply houses in Advanced's territory in violation of this parol understanding.

The defendants objected to the admission of this testimony, and argued that the Agreement was clear on its face that certain end users were exclusive to Advanced and certain others (physicians and clinics) were not and that, by defining exclusive and non-exclusive markets solely in terms of end users, and by omitting any reference to middlemen, the Agreement clearly envisioned that Arden was free to sell to end users not exclusive to Advanced by whatever means it desired. In defendants' view, the Agreement clearly permitted it to sell either directly or through middlemen to physicians and clinics. Consistent with this theory of the Agreement, defendants presented evidence at trial that all the ChemPro 1000s sold to medical supply houses prior to Advanced's termination were resold only to physicians' offices and clinics.[4] Advanced argues that this parol evidence fell within both the ambiguity and incompleteness exceptions to the parol evidence rule and that the evidence was therefore admissible. We consider each exception in turn.

According to Advanced, the contract was plagued with ambiguities about alternate site distributors: it did not state who could sell in the non-exclusive market, did not state whether Advanced's selling to the non-exclusive market through subdistributors was permitted, and did not define the breadth of the non-exclusive market. We disagree and hold that the contract was not ambiguous on this point within the meaning of the parol evidence rule. Therefore, admission of the evidence under the ambiguity exception to the parol evidence rule was inappropriate.

Primarily, we reject Advanced's argument because it distorts the ambiguity exception to the parol evidence rule. Minnesota, like most jurisdictions, admits parol evidence to clarify ambiguous terms in a contract. See *Apple Valley Red–E–Mix, Inc. v. Mills–Winfield Engineering Sales, Inc.*, 436 N.W.2d 121, 123 (Minn.App.1989). Here, however, plaintiff introduced evidence about *additional* agreements, not evidence to clarify the terms of the written agreement. Minnesota strictly forbids efforts to create ambiguity by reference to anything other than the terms of the contract. See *Kenko, Inc. v. Lowry Hill Construction Co.*, 392 N.W.2d 18, 20 (Minn. App.1986) ("In this case, writings other than the contract could not be used to create an ambiguity which did not exist in the contract itself."). Quite simply, Advanced's contention that there was an entirely separate agreement designed to cover middlemen is based not on ambiguity in the terms of the contract but rather on its argument that an additional agreement existed.

Advanced attempts to place its contention within the ambiguity rubric by arguing that the term "not exclusive" is ambiguous. However, as we have discussed with respect to the evidence about Circadian, we believe that the meaning of that term in the contract is clear. In reality, the ambiguity that Advanced attempts to create is based on its explanation of what took place during the negotiations preceding the contract's signing and not on the language of the written agreement.[5] In sum, although

---

**4.** Indeed, some of the evidence introduced at trial suggested that contracts that the defendants executed with other distributors restricted those distributors to reselling to physicians' offices and clinics alone.

**5.** Indeed, the different parol agreements that Advanced seeks to admit are mutually exclusive.

Advanced justifies admission of the evidence about Arden's pre-existing deal with Circadian by saying that the phrase "not exclusive" refers *only* to Circadian's right to sell to physicians' offices and clinics. Here, however, to justify admission of evidence about an exclusive right to sell to subdistributors, Advanced claims that the "not exclusive" language refers only to di-

plaintiff's version of the events surrounding negotiations for the contract is plausible, the evidence relating to them was not properly admitted to clarify the written terms.

We must also consider Advanced's second argument—that parol evidence was admissible to describe additional elements of the Agreement not contained in the written instrument because the writing was incomplete. As we have already suggested, Advanced has a difficult case to make under this exception since the contract stated that it was "the complete understanding and contract between the parties." See *Taylor*, 263 N.W. at 539–40. Not all evidence of agreements existing outside the writing may be admitted to show that the writing is incomplete. Instead, Advanced must demonstrate that the alleged parol agreement is "one that parties would not ordinarily be expected to embody in the writing." Id. Also, "[the Agreement] must not be so clearly connected with the principal transaction as to be part and parcel of it." Id. Advanced has not satisfied either standard. Certainly if this agreement were designed to prohibit sales to subdistributors, one would expect that the parties would say so explicitly. Such a prohibition would significantly affect the rights of both parties, and experienced businessmen would be expected to reduce it to writing. Further, the alleged parol agreement is connected intimately with the distribution rights specified in the contract. Hence, the parol evidence rule prohibits the admission of additional evidence to explain the writing. Advanced's argument that the structure of distribution was incomplete is unpersuasive, given that one would expect parties to include in the writing details of such a structure.

We have concluded previously, with respect to the evidence about Circadian, that the Agreement clearly states that physicians' offices and clinics are non-exclusive markets, and that parol evidence to the contrary should not have been admitted. The same is true with respect to evidence about an alleged parol agreement granting exclusive rights to Advanced to sell to subdistributors. The contract's failure to mention subdistributors does not persuade us that the contract is "incomplete" or "ambiguous." Thus, it was error for the district court to admit the evidence relating to the alleged parol agreement that granted Advanced exclusive rights to sell to all subdistributors.

### G. *Effect of the Erroneous Admission*

We have concluded that it was not a violation of the parol evidence rule for the district court to admit evidence regarding (1) defendants' sales of the ChemPro 500 and (2) withdrawal of marketing support previously provided by regional sales managers. These two pieces of evidence constitute independent theories of contract breach. Moreover, the evidence of defendants' breach via their hardball tactics was strong at trial. Therefore, because there was sufficient other evidence on which to sustain the verdict, the question arises whether the court's error in permitting Advanced to introduce parol evidence of its pre-contractual understanding of its exclusive rights to sell ChemPro 1000s to physicians, clinics, and subdistributors warrants reversal.

In order to affirm the jury's verdict on liability, we must find that the erroneous admission of the parol evidence was harmless error. A determination of harmless error depends on whether "it is highly probable that the error did not contribute to the judgment." See *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 924 (3d Cir.1985) (quoting *Government of the Virgin Islands v. Toto*, 529 F.2d 278,

rect sales to end users. These explanations are mutually exclusive. Arden's contract with Circadian was a distribution agreement, and if the "not exclusive" language was placed in the contract to accommodate that pre-existing deal, then the language obviously allows for sales by Arden to physicians' offices and clinics through other distributors (i.e., Circadian) as well as

direct sales to end users. If, however, the "not exclusive" language only concerns end users, then it would not have accommodated the pre-existing deal with Circadian. Although we do not base our holding on the tension between Advanced's arguments, we do note the difficulty of construing the alleged parol contracts consistently.

283 (3d Cir.1976)). This rigorous test is not met here. Testimony at trial indicated that defendants "schemed" to sell through other alternate site distributors who in turn sold to physicians' offices and clinics. Parol evidence suggested that this was impermissible under an agreement not reflected in the writing. The jury quite reasonably might have concluded that violation of this parol agreement was a breach of contract and might have awarded damages on that theory of breach alone.

We recognize that the other theories of breach may have been the basis of the jury's verdict. However, we cannot say under the rigorous *McQueeney* standard that admission of parol evidence under this theory was harmless. Hence, we will reverse and remand for a new trial on liability for both the breach of contract claim and the tortious interference claim.

### III. DAMAGES ISSUES ON RETRIAL

Although we will reverse and remand for a new trial, we must address several damages issues raised on appeal to provide guidance to the district court on remand, for the issues are important to the case and will certainly arise on retrial.[6]

#### A. *Mitigation of Damages*

■ The defendants initially complain of the district court's refusal to charge the jury on mitigation of damages. The law requires, of course, that a non-breaching party mitigate its damages if possible. See *Lesmeister v. Dilly*, 330 N.W.2d 95, 103 (Minn.1983).

■ In denying the defendants' motions for a new trial and judgment notwithstanding the verdict, the district court explained its reasons for refusing to charge the jury that Advanced had an obligation to mitigate its damages as follows:

> [T]he court is no more convinced now than it was convinced at [the] charging conference that a mitigating instruction is appropriate. Defendants suggest that Advanced could lessen its losses under the breach of contract by searching for new lines of medical equipment to carry. This argument ignores the reality of Advanced's business. Advanced is in the business of distributing medical equipment for various manufacturers. By adding any number of new lines, Advanced can increase its sales but never recover the loss from the ChemPro contract because those sales and profits have been removed from them by the breach of the contract. Advanced always has a right to seek to add new products to its line. *See, Storage Technology Corp. v. Trust Company of New Jersey*, 842 F.2d 54 (3d Cir.1988).

*Advanced Medical, Inc. v. Arden Medical Systems*, No. 87–3059, slip op. at 5–6, 1990 WL 131072 (E.D.Pa. Sept. 5, 1990).

The district court's reference to *Storage Technology* demonstrates that the district court embraced the so-called "lost volume seller" theory of mitigation of contract damages. This court has described that theory as follows:

> A lost volume seller is one who upon a buyer's breach of contract, resells the article to a second purchaser at the price agreed to by the first purchaser. The second purchaser, however, would have purchased a similar article notwithstand-

---

**6.** In view of the result, we need not address two other issues strongly pressed by the defendants. First, Mark Knudson, Arden's co-founder, failed to testify, a fact to which Advanced referred in its closing argument. Defendants object to the district court's "missing witness" charge and the court's failure to permit the defendants to explain during closing why they failed to produce Knudson. Since we do not know whether Knudson will be a missing witness on retrial, we do not address the issue. However, the claimed error in the charge was the result of a verbal slip (the district court stated that the jury "must" instead of "may" draw an adverse infer-

ence from Knudson's absence) which obviously will not be repeated. Second, defendants contend that the judgment awarding attorneys' fees under the Advanced–Arden contract should be reversed or vacated because (a) the fees were determined under inapplicable fee-shifting statutes; (b) the court improperly shifted the burden of proof to defendants and failed to adjust the award downward for noncompensable claims; (c) the award was based on inadequate fee records; and (d) the award was unreasonably high. Because we remand for a new trial, we need not reach this issue which will, if it arises again, be decided on a different record.

ing the first purchaser's breach. Under such circumstances, when the seller resells the article, he is still not made whole because "he will have lost one sale, one profit, over the course of the year."

*Storage Technology*, 842 F.2d at 56 n. 2 (citation omitted). In other words, a seller with a theoretically infinite supply of fungible goods to sell cannot mitigate the damages flowing from a breached sale by selling to another buyer. The seller will always, in the end, have only one sale instead of two, and therefore will suffer damages. See generally John Murray, *Murray on Contracts*, § 122(D) at 698–99 (3d ed. 1990).

The lost volume seller theory does not fit the instant dispute in one critical respect. Courts typically invoke the theory in cases where the prospective *buyer* breaches. See, for example, *Kearsarge Computer Inc. v. Acme Staple Co.*, 116 N.H. 705, 366 A.2d 467 (1976). The instant dispute, to the contrary, arises out of the defendant-*sellers'* breach of the Agreement. Advanced desired to purchase ChemPro 1000s, so that it could resell them; unlike the seller who loses his sale forever, Advanced might conceivably have covered its losses by purchasing and distributing a similar product from a different manufacturer. The defendants offered evidence at trial that numerous similar blood analyzers are available on the market and are capable of performing substantially the same functions. Since a jury might find on this record that many customers will accept, indeed welcome, substitute blood analyzers, it cannot be said as a matter of law that Advanced could not have mitigated its damages.[7] Therefore defendants were entitled to an instruction on the duty to mitigate.

We recognize that it is no easy task for a jury to weigh the evidence regarding the quality, price, availability, and functional capacities of other blood analyzers and to derive an appropriate prediction of the de-

gree to which Advanced could have and should have mitigated its damages. But this complexity does not permit avoiding the issue altogether, to the defendants' detriment, by absolving Advanced of its duty to mitigate.

### B. *Relationship Between the Tort and Contract Damages*

■ On the issue of compensatory damages, we also note that both the jury charge and the interrogatories submitted to the jury failed to inform the jury that recovery for tortious interference with an existing contract is limited, absent proof of consequential damages, to the breach of contract damages suffered by the plaintiff. See *Western Oil & Fuel Co. v. Kemp*, 245 F.2d 633, 644 (8th Cir.1957) (Minnesota law); *accord American Air Filter v. McNichol*, 527 F.2d 1297, 1300 (3d Cir.1975) (Pennsylvania law). As a consequence of this oversight, the jury returned a verdict of $543,750 against Johnson & Johnson, Ortho and JJPD, an amount three times greater than the $181,250 in contract damages awarded against Arden. Failure to instruct that tort damages should not exceed contract damages was error and should not be repeated on remand.

### C. *Punitive Damages*
#### 1. *The "Crush" Statement*

Although the verdict for punitive damages falls with the reversal of the judgment, two issues critical to it will certainly recur on retrial and must also be addressed. First, we must consider whether the district court inappropriately excluded evidence concerning the so-called "crush" threat. An important part of plaintiff's punitive damages claim was the testimony of its witness, Steven Bush, that James Hobbs, an officer of Ortho and Arden, stated that, given further intransigence by Advanced, Johnson & Johnson would "crush" Advanced. The full statement is set forth

---

7. Defendants also mount an argument based upon Advanced's failure to sell some twenty ChemPro 1000s that were in Advanced's warehouse when it was terminated, and which it simply sent back to Arden. The effect of this putative failure to mitigate is so small in comparison with the major mitigation issue discussed in the text, however, that we need not address it here.

at 191. As explained there, defendants object to the exclusion of additional evidence about the statement because they contend that the additional evidence would have clarified Hobbs's state of mind—i.e., that he was referring to potential litigation.

■ Plaintiffs offered Bush's testimony about Hobbs's "crush" statement in part, if not in full, to demonstrate that defendants had engaged in sufficiently outrageous conduct to merit an award of punitive damages. To justify an award of punitive damages, Pennsylvania law requires a plaintiff to demonstrate that a defendant engaged in outrageous conduct that was willful or malicious. See *Burke v. Maassen*, 904 F.2d 178, 182–83 (3d Cir.1990); *Pittsburgh Outdoor Advertising Co. v. Virginia Manor Apts., Inc.*, 436 Pa. 350, 260 A.2d 801, 803 (1970). In evaluating willfulness, the court must allow for examination of the defendant's state of mind, which is an appropriate consideration for the jury. See *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 748 (1984). Hence, we are especially wary of the exclusion of evidence probative of defendants' state of mind.

■ We think that defendants' explanation of the statement should have been admitted. After the district court refused to let in evidence of Bush's previous statement about the prior litigiousness of Advanced, the jury may well have formed a far worse impression of the comment's meaning than they would have had they had the opportunity to consider defendants' explanation. The difference is between a statement that said the defendants would crush the plaintiff generally and a statement that said the defendants would crush the opponent in litigation. The former strikes us as a far more pernicious statement than the latter. While it seems implausible that this statement actually referred to potential litigation, we believe that the jury should have had the opportunity to evaluate all of the evidence.

### 2. Sufficiency of the Evidence on Punitive Damages

■ Notwithstanding the foregoing, we have no difficulty deciding that the evidence in this case was adequate to instruct the jury about the possibility of making a punitive damages award against the Johnson & Johnson defendants. In order to prove entitlement to punitive damages under Pennsylvania law,[8] a plaintiff must prove "malice, vindictiveness and a wholly wanton disregard" for the rights of others. See *Smith v. Renaut*, 387 Pa.Super. 299, 564 A.2d 188, 193 (1989). The evidence heard by the jury about the coercive nature of the Johnson & Johnson defendants' strategy to undermine Advanced clearly was sufficient to support such a verdict under this standard.

Advanced presented evidence that agents of the Johnson & Johnson defendants lied to officers of Advanced in March, 1987. The defendants told Advanced that they would resume the type of service support that they had previously given, all the while knowing that such service would not resume and that, in fact, Johnson & Johnson would continue to pursue a hardball strategy designed to force Advanced to agree to abandon its contractual rights. Additionally, Advanced introduced evidence to suggest that the Johnson & Johnson defendants were not merely attempting to buy out the contract but that they were engaged in a conscious policy of playing hardball in order to achieve that end. Such indifference to the rights of Advanced under the contract is adequate to support a finding of liability for punitive damages. Accordingly, the district court is free to resubmit the issue.[9] Nonetheless, because

---

8. Because the Agreement specified that only the contract would be governed by Minnesota law, we do not find that state's law relevant to punitive damages, which emanate from plaintiff's tort claim. Instead, because the parties have not on appeal objected to the district court's application of Pennsylvania law on punitive damages, we find that Pennsylvania law should govern. See *Mellon Bank v. Aetna Business Credit*, 619 F.2d 1001, 1005 n. 1 (3d Cir.1980).

9. Because we are remanding for a new trial, we do not reach the argument raised by the defendants that the award of punitive damages in this case violated defendants' Fourteenth Amendment Due Process Rights. See *Pacific Mutual Life Insurance v. Haslip*, —— U.S. ——, 111 S.Ct.

liability must be retried, we must set aside the finding of liability for punitive damages.

## IV. CONCLUSION

The judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion. The district court's order awarding attorneys' fees to plaintiff will also be reversed. The parties shall bear their own costs.

1032, 113 L.Ed.2d 1 (1991). We also do not address the question whether the punitive damages award was excessive under Pennsylvania law.