**Maurice and Karron
DeMARAIS, Appellants,**

v.

**NORTH STAR MUTUAL INSURANCE
COMPANY, Respondent.**

**No. C2–86–1373.**

Court of Appeals of Minnesota.

May 12, 1987.

Richard M. Johnson, Red Wing, for appellants.

Kenneth M. Dodge, Minneapolis, for respondent.

Heard, considered and decided by CRIPPEN, P.J., and WOZNIAK and MULALLY, JJ.[*]

## OPINION

CRIPPEN, Presiding Judge.

This appeal questions whether the evidence is sufficient to sustain the jury's verdict that either or both appellants caused or participated in the cause of a fire that destroyed their home. We affirm.

## FACTS

Appellants' home was destroyed in a fire. Respondent refused to pay the insurance proceeds under a homeowners policy, alleging that the fire was incendiary in nature and appellants had caused or participated in the cause of the fire. Appellants brought suit for the insurance proceeds and denied any responsibility for the fire. The jury found for respondent.

Appellants, Maurice and Karron DeMarais, purchased their home in February 1979. The property was located at Hillwood Circle in Lake City, Minnesota. The home was new at the time appellants bought it. On March 6, 1984, the home was destroyed by a gas explosion and fire. Appellants and two of their children lived in the home from the time of purchase up to the time of the fire. Maurice DeMarais conducted an upholstery business in the basement of the home. Appellants made some improvements in the property. Specifically, they remodeled part of the basement to be used as a bedroom, stained and painted the house, and built a patio in the backyard.

---

[*] Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

Maurice DeMarais testified that on the day of the fire they were out of fuel to heat the furnace and the hot water heater. He sent the two children to stay with their sister, who also lived in Lake City. DeMarais ordered fuel to be delivered to his home that same day. After the fuel arrived, the DeMaraises and two relatives went to Prairie Island to play bingo. The DeMaraises left their home at approximately 6:25 p.m. They spent the evening at the bingo hall and left Prairie Island at approximately 10:50 p.m.

Appellants returned to Lake City and drove to their daughter's home to pick up the children. While they were there, at approximately 11:35 p.m., they heard the fire siren and heard a fire in Hillwood Circle called into the fire department over a radio scanner. They drove to Hillwood Circle and found their house was on fire.

At trial, respondent introduced evidence to prove appellants caused or participated in the fire. Respondent claimed the fire was caused when a gas pipe cap was removed, causing a gas leak in the home. In addition, respondent claimed an ignition source, a kerosene lantern, was placed near the hot water heater. The gas leak combined with the kerosene lantern caused the explosion. Respondent produced evidence of appellants' serious financial problems and dissatisfaction with the property as the motive for intentionally destroying the house.

Appellants introduced evidence of prior problems with their water heater, which they contend may have caused the gas explosion and fire. Appellants' expert testified that undetected gas leaks could have caused the fire.

## ISSUES

1. Are the evidentiary rulings and jury instructions within the scope of appellate review?

2. Is the evidence sufficient to support the jury verdict and judgment in favor of respondent?

## ANALYSIS

■ 1. As a general rule, "evidentiary rulings and jury instructions are subject to appellate review only if there has been a motion for a new trial in which such matters have been assigned as error." *Sauter v. Wasemiller*, 389 N.W.2d 200, 201 (Minn. 1986). To preserve these issues for review, counsel must make timely objection and move the trial court for a new trial. *Id.* at 202.

Appellants' motion for a new trial was untimely and subsequently withdrawn. By its order, dated January 6, 1987, this court determined that the only issue to be reviewed on appeal is the sufficiency of the evidence.

■ 2. In a civil action for insurance proceeds allegedly due, an insurer who claims arson as a defense must demonstrate by a preponderance of the evidence that the insured either set the fire or arranged to have it set. *Quast v. Prudential Property & Casualty Co.*, 267 N.W.2d 493, 495 (Minn.1978). When the sufficiency of the evidence is challenged on appeal, we are to view the evidence in the light most favorable to the prevailing party. *Lesmeister v. Dilly*, 330 N.W.2d 95, 100 (Minn. 1983). The verdict will not be reversed if the evidence reasonably or fairly tends to sustain it. *Id.*

■ Respondent relied on circumstantial evidence to prove its defense that appellants set the fire or arranged to have the fire set. To support a verdict, circumstantial evidence must outweigh any conflicting inferences. *Republic National Life Insurance Co. v. Marquette Bank*, 312 Minn. 162, 168, 251 N.W.2d 120, 124 (1977). Direct proof of arson is seldom available, and the insurer may use circumstantial evidence to support the inference that the insured set the fire or arranged to have it set. *Quast*, 267 N.W.2d at 495. Evidence of the fire's incendiary nature, combined with evidence of motive, is sufficient to support a jury's verdict that appellants caused the fire, and to outweigh any conflicting inference denying a claim for payment under the insurance policy. *Id.*

### a. Evidence of the Fire's Origin

Respondent presented evidence that supported an inference that the fire was intentionally caused and was not accidental. Two employees of the State Fire Marshall's office testified to the results of their investigation of the fire. Richard Holmes supervises the transportation of gases by pipeline and investigates LP gas explosions for the state office. James Hellerud is an arson investigator for the state office.

Hellerud testified that four officials, including himself and Holmes, conducted a scene search of the property and home the day after the fire. The structural remains of the home indicated the fire occurred in the lower level of the two story walkout home. The furnace and hot water heater were located in the utility area of the lower level.

In the course of their search, the investigators found the drip leg cap of the hot water heater was missing. The drip leg is a section of pipe attached to the hot water heater which extends vertically along the side of the heater. The end of the drip leg pipe collects sediment running through the gas line. The drip leg is sealed with a threaded steel cap that screws onto the drip leg pipe. The investigators searched a portion of the utility room for the missing cap, but were not able to locate it.

Holmes testified about the installation and normal wear of a drip leg cap. The cap is necessary to prevent gas leakage, and therefore must be securely in place when the heater is installed and thereafter during the life of the heater. Holmes testified that the cap, which is attached with pipe joint compound and screwed tightly into the adjoining pipe, does not come off in the normal course of operation. Holmes testified that the drip leg pipe threads were not damaged, indicating the drip leg cap was not forcibly torn away. When examined by Holmes at trial, the pipe threads did not show any evidence of damage.

The investigators found the remains of a kerosene lantern, including the wick, sitting at the bottom of the stairway, a few feet away from the water heater. Hellerud testified the lantern was sitting on the concrete floor, covered by debris. Appellants testified that at the time of the explosion the lantern was in the linen closet on the upper level of the home. Hellerud testified that the fact that the lantern was at the bottom of the debris is inconsistent with the claim that the lamp was in the upper level at the time of the explosion.

Based on this evidence, respondent's experts concluded the fire was caused in the following manner. On March 6, 1984, someone arrived at the house about ten or fifteen minutes before the explosion. They turned off the outside control to the LP tank, went into the house and unscrewed the hot water heater drip leg cap. Next, a kerosene lamp was placed at the foot of the steps near the hot water heater. Returning outside, the LP control was turned on so that the gas supply into the house resumed. Gas leaking from the removed drip leg cap, ignited by flame from the kerosene lamp, caused the explosion and fire.

Appellants attempted to prove that the gas explosion and fire was caused by a malfunction of the hot water heater, or in the alternative, by a gas leak from the piping system. Dr. Quest, a chemical engineer who investigates gas explosions for various gas companies on a consulting basis, testified for appellants. Dr. Quest did not conduct an independent investigation of the property. Dr. Quest's opinions regarding the fire were based upon a photograph of the home before and after the explosion, the State Fire Marshall's report prepared by respondent's expert witnesses, depositions of respondent's expert witnesses, and statements of appellants, their neighbors, and the person who delivered the propane on the day of the explosion. While Maurice DeMarais' testimony emphasized a history of problems with the operation of the burner of the hot water heater, Dr. Quest's testimony did not establish a causal connection between the hot water burner and the explosion. Dr. Quest's alternative theory, an explosion caused by a crack at a threaded connection in the piping system, was not supported by physical evidence.

Dr. Quest did not disagree with respondent's theory of the fire's cause; rather, he based his opinion on Maurice DeMarais' testimony that he turned the gas on at around 6:30 p.m. and the fire occurred five hours later. Dr. Quest testified that if the kerosene lamp was near the hot water heater, an explosion caused by a gas leak would have occurred five to thirty minutes after the gas was turned on. As respondent points out, the jury could have concluded that appellant returned to the house shortly before the explosion or directed someone else to perform the acts which led to the fire and explosion.

On cross-examination, Dr. Quest agreed that the information obtained from his investigation is consistent with the theory that someone arrived at the house ten to fifteen minutes before the explosion, turned off the outside control to the tank, unscrewed the drip leg cap, placed a kerosene lamp as a source of ignition, returned outside and turned on the outside valve, and left the scene. Dr. Quest also agreed that respondent's theory, based on the missing drip leg cap and the kerosene lantern, is the best explanation for the explosion and fire based on the physical evidence alone.

Respondent introduced sufficient evidence for the jury to infer that the drip leg cap was purposely removed and the resulting gas leak, combined with an ignition source, caused the explosion. No evidence, except appellant's own testimony, discredited respondent's theory.

### b. Incendiary Fire Planned?

Both parties presented circumstantial evidence relating to whether appellants planned the fire. Appellants presented evidence that all personal belongings, except the clothes worn by family members at the time of the fire, were destroyed. These personal belongings include items of unique value to family members, such as family photos, trophies, and Alaskan art and fur parkas.

The fact that no one was home at the time of the fire was introduced as circumstantial evidence of a plan to set the fire. The record indicates that at the time of the explosion all family members were away from home, even though they normally would have returned earlier in the evening, and that their prolonged absence on this occasion was without sufficient explanation.

### c. Evidence of Motive

Respondent relied upon appellants' ongoing dissatisfaction with their home and appellants' financial problems as evidence of motive. The evidence demonstrates appellants' dissatisfaction with their home. In 1982, appellants sued the builder for erosion on the property caused by drainage from the sewage system. During the course of that litigation, Maurice DeMarais' answers to interrogatories included his statement that he believed the floorboard materials were inadequate and that the house is known locally as a "lemon." The DeMarais home was for sale the five months preceding the fire.

In December 1982, appellants informed the mortgagee bank of the erosion problems and requested that the bank delay action on appellants' delinquent mortgage payments due to the pending lawsuit. The bank informed appellants that it was going to proceed with foreclosure proceedings. In March 1983, the bank received all past due payments from DeMarais.

In September 1983, the bank initiated a second foreclosure proceeding. In October of the same year, DeMarais obtained a second mortgage from the bank in the amount of $5654. The proceeds of the second mortgage were applied to past due obligations, including overdue payments on the first mortgage.

From October 1983 to March 6, 1984, appellants did not make any mortgage payments. On January 9, 1984, the bank sent a letter advising appellants that foreclosure proceedings would begin in sixty days. The fire occurred three days before the sixty day period expired.

### DECISION

The evidence reasonably tends to sustain the verdict. Respondent presented sufficient evidence of the incendiary nature of

the fire and appellants' motive to support the inference that appellants set the fire or caused the fire to be set.

**Affirmed.**