*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A16-0611**

Victoria L. Sloan,
Appellant,

vs.

Kelly O'Neil,
Respondent,

Regina Sabbia,
Respondent,

Kerrie Cathcart,
Respondent,

Uptown Realty & Management, LLC,
Defendant.

**Filed December 27, 2016**
**Affirmed**
**Peterson, Judge**

Hennepin County District Court
File No. 27-CV-14-12814

Susan D. Minsberg, St. Paul, Minnesota (for appellant)

Samuel C. Spaid, Minneapolis, Minnesota (for respondent O'Neil)

Joshua S. Casper, St. Paul, Minnesota (for respondent Sabbia)

Craig A. Buske, Shulman and Buske, PLLC, Minneapolis, Minnesota (for respondent Cathcart)

Considered and decided by Cleary, Chief Judge; Peterson, Judge; and Worke, Judge.

**UNPUBLISHED OPINION**

**PETERSON**, Judge

In this landlord-tenant dispute arising from damage to a rental unit, appellant-landlord argues that the district court erred in (1) granting summary judgment for respondent-tenants on appellant's claim for willful destruction of property, (2) awarding statutory attorney fees to respondents for the willful-destruction-of-property claim, (3) offsetting the jury verdict on appellant's breach-of-contract claim against respondents by the amount of appellant's settlement with defendant property-management company, and (4) deducting the amount of the security deposit from the jury verdict. We affirm.

**FACTS**

Appellant-landlord Victoria L. Sloan, through defendant Uptown Realty & Property Management, rented a house that she owned to respondent-tenants Kelly O'Neil, Regina Sabbia, and Kerrie Cathcart. The lease term ran from April 15, 2013, through April 30, 2014. Although Sloan initially intended to include a no-dog provision in the lease, she agreed to allow O'Neil's dog to live in the home. To accommodate O'Neil's dog, the lease permitted one dog weighing less than 50 pounds to live in the house.

Before renting the house, Sloan, her real-estate agent, and friends and family members visited it multiple times, and Sloan and her sister lived in the home for two weeks. No one noted any pet damage to the home or any damage of any kind to woodwork or millwork. Damages noted in an inspection report prepared by Uptown Realty before the

tenants moved in included one tiny crack in the stained glass on the dining-room door, a hole that had been repaired and some permanent staining in the master-bedroom carpeting, water damage on the upstairs foyer ceiling, uncracked but bowed stained glass on a staircase window, and two staircase spindles cracked near the bottom but not broken through. The report described the dining room's sliding wooden passage or pocket door as "flawless."

In June 2013, Sloan's sister was at the house and saw two dogs inside scratching the woodwork under a living-room window. She saw what appeared to be urine stains on carpeting in the house and smelled a urine odor on the second floor. O'Neil admitted that a second dog was present two to three times a month for an overnight stay from May through October 2013. In September 2013, Sloan talked to respondents about the urine stains on the carpeting, which were still there, and respondents assured Sloan that the issue would be resolved. In November 2013, a contractor saw dog feces inside the house and urine stains on the carpeting.

Following these discoveries, Sloan hired contractor Tim Jahnke to inspect the extent of urine damage. Using an ultraviolet light, Jahnke found several areas of urine stains on the library carpeting. He also found a large urine stain in the front south fireplace room under a dog bed, a few urination spots in the second-floor hallway, and two very small urination spots in the master bedroom.

Sloan then hired Dan Schilling, who had 33 years of experience as a building inspector and had been providing environmental-inspection services since 1998, to perform an environmental inspection of the home. Schilling concluded that the urine damage and

3

the woodwork damage attributable to dogs was inconsistent with the previous owner's small dog. Schilling determined that the urine and woodwork damage were consistent with O'Neil's dog and the dog that visited between May and October 2013.

Using an ultraviolet light, Schilling estimated that there were 250 occurrences of urination on library carpeting on the first floor. Schilling found urine and fecal damage to the hardwood flooring in the kitchen. Schilling found that the edges of a Persian rug in the dining room had been damaged by dog claws. Schilling described the urine odors in the house as "pungent upon entry."

In May 2014, after respondents had moved out, Schilling performed a follow-up inspection, during which he found additional damage. Paint and wallpaper in the first-floor bathroom were peeling due to respondents' failure to use the exhaust fan. Hardwood flooring in a second-floor bedroom was scratched by respondents' furniture. A front-door screen was ripped out. The wooden door jamb on that door was split due to a forced entry, during which a chain lock was forced open. The hardwood finish on built-in cabinetry was scratched and stained. Damage to leaded glass on the cabinetry was consistent with respondents' bicycles' pedals and handle bars. Schilling determined that respondents' indoor storage of their bicycles was the apparent "cause of breakage to a wood panel of a custom-crafted historic wood door, breakage to stair spindles, damage[] [to] the rim on a newel post, and severely scratched and gouged woodwork in various areas." The damage was consistent with the sharp metal edges of bicycle axles and pedals. Two pieces of trim molding were missing from a staircase post adjacent to the damaged spindles. Damage to hardwood trim on a first-floor door and jamb were consistent with bicycle pedals and axles.

4

Schilling also found that damage to the hardwood trim on the stairway going to the second floor and on walls and to the dining-room sliding door were apparently caused by the metal parts of bicycles. Schilling found additional damage to woodwork caused by dog teeth and claws and scratches in the glass in windows and doors caused by dog claws. He found additional damage to the Persian rug caused by dog teeth or claws and additional urine damage to carpeting and hardwood flooring on the first floor.

Schilling determined that chemical stains on the hardwood flooring under the library carpet were due to the overuse of chemicals to clean the carpet. Schilling also stated that, due to the carpet pad remaining soaked with dog urine for extended time periods, "the foam padding had become bonded to the hardwood flooring." Schilling stated that the 250 instances of urination found on the library carpet during the initial investigation included areas that had not been cleaned, indicating a lack of care or a lack of awareness of the frequency and locations of urination. Schilling opined, "In cases such as this where there have been hundreds of pet urination and fecal accidents in a home, it is reasonable to conclude that [respondents] had direct knowledge of the problem they were creating in the home during their occupancy." Schilling also opined that "the discovered evidences of new and additional damage to the walls, hardwood flooring and woodwork that was caused directly by [respondents] is further proof of continued lack of care for the home they intended on vacating." In addressing the damage caused by bicycles, Schilling indicated that respondents' conduct was careless.

Sloan brought this action against respondents and Uptown Realty alleging claims for breach of contract and willful destruction of rental property against respondents and

claims for breach of contract, negligent misrepresentation, and unjust enrichment against Uptown Realty. Sloan settled her claims against Uptown Realty.

After respondents moved for summary judgment on the willful-destruction-of-rental-property claim, Schilling stated in an affidavit:

> The nature of the following damage, in my opinion, was caused willfully by humans.
>
> a. Scratching and gouging of hardwood floor in second floor bedroom.
>
> b. Ripped front door screen and broken wood door jamb.
>
> c. Deep scratches and stains on the horizontal surface of historic built-in cabinetry.
>
> d. Cracked leaded glass on historic built-in cabinetry, the heights of which are consistent with bicycle pedals and handlebars.
>
> e. Broken wooden spindles that support the bannister railing between the first and second floors.
>
> f. Gouging and damage of hardwood trim, consistent with being hit by bicycles.
>
> g. Two impact cracks and gouges in the historic, custom built sliding passage door. As noted in the move in/move out report . . ., Uptown Realty & Management noted on the tenant's move in-"Pocket door flawless". I also was able to ascertain that the impact cracks were recent because there was no dust settled in the cracks.
>
> h. Original woodwork on cabinet shelving, doors and windows were further damaged by an improper attempt to repair the damage from the dog(s) by using wood filler and a colored wax pencil. The use of those products will make repair and restoration of the wood more difficult and more expensive.

Schilling also stated, "In my experience serving as an expert witness in landlord/tenant disputes, for [respondents] to willfully allow their dogs to commit such extensive and destructive damage to the property that they were guardian over constitutes willful destruction."

6

The district court granted respondents' motion for summary judgment on the willful-destruction-of-rental-property claim. The district court concluded that the evidence was insufficient to establish genuine issues of material fact on whether respondents willfully and maliciously damaged the house. The district court awarded statutory attorney fees of $5,750 to O'Neil and $1,250 to Cathcart for defending against the willful-destruction-of-rental-property claim. The district court denied Sabbia attorney fees because she is a licensed attorney who represented herself. The district court also ordered Sloan to disclose to the court her settlement agreement with Uptown Realty.

Sloan's breach-of-contract claim against respondents was tried to a jury. Following trial, the district court issued findings of fact, conclusions of law, and order for judgment, as amended by order filed February 8, 2016.[1] The district court adopted the jury's verdict. The jury found:

> a. [Respondents] breached their contract with [Sloan].
> b. [Respondents] (or persons or animals under their control) damaged [Sloan's] property through negligent conduct.
> c. This damage was beyond ordinary wear and tear.
> d. The following amounts fairly and adequately compensate [Sloan] for damages caused by [respondents'] breach:
> > i. Damage to carpet - $1,700
> > ii. Damage to kitchen floor - $0
> > iii. Damage to woodwork - $10,000
> > iv. Damage to glass - $2,260

---

[1] The amendments were due to a clerical error, the failure to address respondents' security deposit, which had been withheld by Sloan.

The jury's award of damages to Sloan totaled $13,960. The district court offset that amount by $10,000 of Sloan's $15,000 settlement with Uptown Realty and also deducted the $2,700 security deposit withheld by Sloan, leaving a balance due to Sloan of $1,260. The district court denied Sloan's motion for a new trial.

This appeal followed.[2]

## D E C I S I O N

### I.

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. We review the district court's grant of summary judgment de novo, to determine whether there are genuine issues of material fact and whether the district court erred in applying the law. *Mattson Ridge, LLC v. Clear Rock Title, LLP*, 824 N.W.2d 622, 627 (Minn. 2012). "We view the evidence in the light most favorable to the party against whom summary judgment was granted." *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002).

To withstand a summary-judgment motion, a party must present specific evidence showing the existence of a genuine issue for trial; speculation is insufficient. *Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn. 1995). Summary judgment may be granted if the party opposing summary judgment has the burden of proof

---

[2] Sloan has a second appeal pending before this court, challenging the district court's denial of her application for costs and disbursements. *Sloan v. O'Neil*, No. A16-1249 (hearing date Jan. 18, 2017).

on an essential element and fails to "present specific admissible facts showing a material fact issue." *Doe v. Archdiocese of St. Paul,* 817 N.W.2d 150, 163 (Minn. 2012) (quotation omitted).

Sloan challenges the summary judgment for respondents on her willful-destruction-of-property claim. Minn. Stat. § 504B.165(a) (2014) states: "An action may be brought for willful and malicious destruction of leased residential rental property. The prevailing party may recover actual damages, costs, and reasonable attorney fees, as well as other equitable relief as determined by the court." "[S]tatutory construction is a question of law, which [an appellate court] review[s] de novo." *Lee v. Lee*, 775 N.W.2d 631, 637 (Minn. 2009). Sloan argues that the district court erred in construing Minn. Stat. § 504B.165(a) as requiring proof of state of mind. The district court concluded that respondents' intent was relevant to the elements of willfulness and maliciousness.

Minn. Stat. § 504B.165(a) does not define the terms willful and malicious, and Minnesota's appellate courts have not construed them in the context of the statute. But the supreme court has addressed these terms in the context of an insurance-policy exclusion. *Hogs Unlimited v. Farm Bureau Mut. Ins. Co.*, 401 N.W.2d 381, 383 (Minn. 1987).

The supreme court has construed willful as synonymous with intentional. *Hogs Unlimited*, 401 N.W.2d at 383. It is unclear from the statutory language whether intentional refers to the act that causes the damage or the damage itself. A presumption exists in criminal and tort law that a person intends the natural and probable consequences of her actions. *Continental W. Ins. Co. v. Toal*, 309 Minn. 169, 175, 244 N.W.2d 121, 125 (1976) (holding that the presumption does not apply to the construction of terms used in

9

insurance contracts). We need not decide whether the presumption applies in the context of section 504B.165 because, even if it does apply, the district court properly granted summary judgment for respondents.

In addressing willfulness, the district court distinguished between intentional and negligent conduct. Sloan argues: "Since [respondents] denied engaging in any conduct that damaged Sloan's home, [respondents'] state of mind is not at issue. If [respondents] had alleged that they accidentally damaged Sloan's home, then they may have put their state of mind at issue." But it was Sloan's burden to prove each of the essential elements of her claim for unlawful destruction. *See Carpenter v. Nelson*, 257 Minn. 424, 427, 101 N.W.2d 918, 921 (1960) (stating that, "[i]n the ordinary civil action, . . . the plaintiff has the burden of proving every essential element of [her] case"). Thus, to prevail on her claim of intentional destruction, Sloan had the burden of proving that respondents damaged her property and that they did so willfully and maliciously.

In his affidavit, Schilling identified the following damage as having, "in [his] opinion," been caused willfully by humans: scratching and gouging of hardwood floor in second-floor bedroom; ripped front-door screen and broken wood door jamb, deep scratches and stains on the horizontal surface of historic built-in cabinetry; cracked leaded glass on historic built-in cabinetry; broken wooden spindles on staircase railing, gouging and damage of hardwood trim; and two impact cracks and gouges in dining-room sliding door. But Schilling does not explain the reason for his opinion that the damage was caused willfully. For example, he does not state that the damage indicates that the bicycles struck the damaged items with great force. If the intentional conduct is the act causing the

10

damage, at some point, repetitive conduct might support an inference of willful conduct. But the record does not contain evidence of such repetition. The closest case for intentional conduct is the ripped front-door screen and broken wood door jamb. But Schilling does not explain how he determined that the door jamb was broken in an effort to force the chain lock rather than accidentally by someone who did not know that the chain lock was engaged or that the screen was ripped out at the same time the jamb was damaged.

The use of wood filler and wax pencil was an intentional act. But as the district court concluded, there was no evidence that use of those items destroyed any property, only that their use would make repair more difficult and more expensive.

Regarding the damage caused by dogs' teeth and claws, as with the human damage, Schilling did not identify the number of occurrences required to cause the damage. Most of the damage to the carpet was discovered only after ultraviolet light was used and forensic testing was conducted. Sloan does not cite evidence in the record showing when the carpet was installed. Schilling's second report states that the urine damage was inconsistent with the previous owner's small dog. But the record does not show that no other dogs resided in the home after the carpet was installed.

Because the evidence was insufficient to create a genuine issue of material fact on whether respondents willfully and maliciously, rather than negligently, damaged Sloan's property, the district court properly granted summary judgment for respondents on the willful-destruction-of-property claim.

11

**II.**

Sloan challenges the statutory award of attorney fees to O'Neil and Cathcart on her willful-destruction-of-property claim. Minn. Stat. § 504B.165(a) provides for an award of attorney fees to the prevailing party.

Sloan argues that, when determining the prevailing party for purposes of an attorney fee award under section 504B.165(a), the district court should have considered the entire case and not just the willful-destruction-of-rental-property claim. We disagree. Section 504B.165(a) applies specifically to a willful-destruction-of-rental-property claim. *Cf. Fox v. Vice*, 563 U.S. 826, 833-34, 131 S. Ct. 2205, 2213-14 (2011) (construing the statute authorizing an award of attorney fees to the prevailing party in specified civil-rights actions as permitting a fee award to a party who does not prevail on every claim).

The cases relied on by Sloan are not on point. *See Borchert v. Maloney*, 581 N.W.2d 838, 840 (Minn. 1998) (applying general costs-and-disbursements statute and rejecting argument that defendant was prevailing party when final judgment was in favor of plaintiff but amount of judgment was less than settlement offer by defendant); *Elsenpeter v. St. Michael Mall Inc.*, 794 N.W.2d 667, 673 (Minn. App. 2011) (explaining that, when determining prevailing party, "[n]o allowance is provided in favor of a party who may prevail upon intermediate motions or preliminary proceedings" (quotation omitted)).

Sloan also challenges the amount of attorney fees awarded to O'Neil and Cathcart. Generally, this court reviews an award of attorney fees for an abuse of discretion. *Carlson v. SALA Architects, Inc.,* 732 N.W.2d 324, 331 (Minn. App. 2007), *review denied* (Minn. Aug. 21, 2007).

The district court used the lodestar method to determine the amount of attorney fees. The lodestar method of determining attorney fees requires district courts to consider the reasonableness of the number of hours billed and the fee rate. *Green v. BMW of No. America, LLC,* 826 N.W.2d 530, 536 (Minn. 2013). In addition, district courts "should consider all relevant circumstances" in setting the amount of recoverable attorney fees, including: (1) the time and labor required; (2) the nature and difficulty of the responsibility assumed; (3) the amount involved and the results obtained; (4) the fees customarily charged for similar legal services; (5) the experience, reputation, and ability of counsel; and (6) the fee arrangement existing between counsel and the client. *Id.* (quotation omitted). "The reasonableness of [the] hours expended and the fees imposed raise questions of fact," and we reverse findings of fact only if they are clearly erroneous. *City of Maple Grove v. Marketline Constr. Capital, LLC,* 802 N.W.2d 809, 819-20 (Minn. App. 2011).

Sloan argues that the district court erred by awarding $1,250 in attorney fees to Cathcart because the record does not show that she was actually billed for those fees. Craig Buske, Cathcart's attorney, submitted an affidavit with a spreadsheet attached showing that the attorney fees accrued in defending Cathcart against Sloan's unlawful-destruction-of-property claim totaled $4,287.50. Attorney David Shulman submitted an affidavit that stated, "My firm charged reduced hourly rates to Ms. Cathcart in this matter of $175 for my time and $150 for Craig Buske's time." Sloan relies on language in *Green* stating that hours that are not properly billed to a client are not properly billed to an adversary under a statute. *Green*, 826 N.W.2d at 538-39. When making that statement, the *Green* court was addressing "excessive, redundant, or otherwise unnecessary" fees. *Id.* at 539 (quotation

omitted); it was not referring to reasonable fees that were incurred but were not actually billed to the client.

Sloan also objects to the $5,750 in attorney fees awarded to O'Neil because the fee agreement between HOME Line and O'Neil capped her fees at $2,000, and she had paid only $1,000 in fees up to the point of the summary judgment motion. Even if O'Neil's attorney did not charge her the full amount of fees awarded, this court has applied the principle that reasonable attorney fees are to be calculated according to the prevailing market rates in the relevant community, regardless of whether a party is represented by a private or nonprofit attorney. *Reome v. Gottlieb*, 361 N.W.2d 75, 77-78 (Minn. App. 1985), *review denied* (Minn. July 11, 1985).

In a paragraph in their brief, respondents assert that, if they prevail on appeal on the unlawful-destruction claim, this court should award them their costs and attorney fees incurred in defending against these portions of the appeal. The procedure for requesting attorney fees on appeal is set forth in Minn. R. Civ. App. P. 139.06, subd. 1, and requires a party to submit a motion under Minn. R. Civ. App. P. 127. Although Minn. R. Civ. App. P. 139.06, subd. 1, allows the court to award reasonable attorney fees on its own motion, we decline to do so in this case.

**III.**

Sloan argues that the district court erred in deducting $10,000 of her settlement with Uptown Realty from the jury verdict because, under the common-law collateral-source rule, the payment from Uptown should not reduce the jury verdict. "The collateral source rule provides in general that compensation received from a third party will not diminish

14

recovery against a wrongdoer. Because its purpose is punitive, this doctrine has generally been applied only to tort cases." *Hubbard Broad., Inc. v. Loescher*, 291 N.W.2d 216, 222 (Minn. 1980). "The collateral source rule, if applied to an action based on breach of contract, would violate the contractual damage rule that no one shall profit more from the breach of an obligation than from its full performance." *Id.* at 223 (quotation omitted).

> Where A and B owe contract duties to C under separate contracts, and each breaches independently, and it is not reasonably possible to make a division of the damage caused by the separate breaches closely related in point of time, the breaching parties, even though they acted independently, are jointly and severally liable.

*Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn. 1983).

Sloan argues that the settlement with Uptown did not duplicate the damages awarded by the jury. But the district court found:

> In this case, aside from the first floor bathroom [$5,000 of the settlement was attributable to bathroom repair costs], the damages alleged by [Sloan] from Uptown's breach of contract and negligent misrepresentations were caused by [respondents]. [Sloan] alleged that Uptown's actions resulted in her permitting [respondents], and more specifically O'Neil's dog, to reside in her home. [Sloan] claimed that had Uptown honored their contract and not negligently misrepresented information, she would not have allowed the dog and the damage would not have occurred. Because of its actions, [Sloan] explicitly attempted to hold Uptown liable for the damage caused by [respondents], arguing that a property management company can be held liable "for damage that occurred from tenants placed in the property by the management company."

We defer to the district court's findings of fact and will not set them aside unless they are clearly erroneous. *Sirek v. Sirek*, 693 N.W.2d 896, 898 (Minn. App. 2006). The

district court's finding that a portion of Uptown's settlement payment was for the damage caused by respondents is not clearly erroneous. Because the Uptown settlement provided compensation for damages cause by respondents, the district court did not err in deducting $10,000 of the settlement from the jury verdict.

## IV.

Sloan argues that the district court implied that she assented to deduction of the security deposit from the verdict. The finding and order addressing the security deposit do not indicate that Sloan assented to the deduction. Sloan also argues that the jury may have deducted the security deposit because the lease was admitted into evidence, so the jury knew that there was a $2,700 security deposit. The jury, however, was instructed "to determine the amount of money that will fairly and adequately compensate [Sloan] for damages caused by the breach of contract" and that "damages means a sum of money that will fairly and adequately compensate a person who has been harmed." The jury was also instructed that damages "should put [Sloan] in the position she would have been in, if the contract had not been breached," to "not consider the possible effect of your answers to other questions," and that Sloan's "damages are the reasonable cost of repair for restoring the property to substantially the same condition as it was before the harm." Given these instructions, Sloan's argument is not persuasive.

**Affirmed.**